947 F.2d 115
 60 USLW 2328, 14 Employee Benefits Cas. 1776
 TEAMSTERS JOINT COUNCIL NO. 83, Plaintiff-Appellee,
v.
CENTRA, INCORPORATED; Central Cartage Company; Detroit
International Bridge Company; Superior Forwarding Company;
Transport Communications Systems; Central Transport,
Incorporated; Bancroft Trucking Company; GLS Leasco,
Incorporated, Defendants-Appellants.
 No. 90-1815.
 United States Court of Appeals,
Fourth Circuit.
 Argued April 11, 1991.
Decided Oct. 22, 1991.
 
 Patrick A. Moran, Simpson Moran, Birmingham, Ala., argued (Michael A. Nedelman, Fredric A. Smith, Simpson Moran, Birmingham, Thomas E. Spahn, Gary S. Marshall, McGuire, Woods, Battle & Boothe, Richmond, Va., on brief), for defendants-appellants.
 Melvin R. Manning, Manning, Davis Kirby, Richmond, Va., argued (F. William Kirby, Jr., Manning, Davis & Kirby, on brief), for plaintiff-appellee.
 Before ERVIN, Chief Judge, and PHILLIPS and HAMILTON, Circuit Judges.
 OPINION
 ERVIN, Chief Judge:
 
 
 1
 This appeal requires us to consider whether the statutory duty under ERISA of a control group of corporations to make interim withdrawal payments to the multi-employer pension fund of a bankrupt subsidiary may be suspended pending arbitration and appeal in the federal courts. We affirm the district court's finding that the duty to make interim payments continued in this case despite the defenses to liability asserted by the control group.
 
 I.
 
 2
 The present appeal represents only one in a series of actions arising out of the financial difficulties and ultimate Chapter 11 bankruptcy of Mason & Dixon Lines, Inc. (M & D), an interstate trucking company operating out of Tennessee. On behalf of its employees, M & D contributed to Teamsters Joint Council No. 83 of Virginia Pension Fund (Pension Fund), a multi-employer pension plan as defined in the Employee Retirement Income Security Act (ERISA), §§ 3(2), 3(37), & 4001(a)(3), 29 U.S.C. §§ 1002(2), 1002(37) & 1301(a)(3). This plan provides pension benefits to employees of participating employers who are represented by various local unions affiliated with the Teamsters.
 
 
 3
 M & D suffered severe financial losses in 1982 and 1983. On November 29, 1983, M & D's shareholders executed two stock purchase agreements with Central Transport and GLS Leasco, two of the present appellants, whereby Central Transport and GLS Leasco acquired the exclusive right to purchase all outstanding shares of M & D stock. Central Transport and GLS Leasco are wholly-owned subsidiaries of appellant CenTra, Inc. (collectively, "Centra"). On January 4, 1984, Centra received temporary ICC authority to operate M & D, and Centra assumed control of M & D on January 9. Centra obtained permanent ICC authority, together with approval of its proposed stock acquisitions, on March 7, 1984. On February 2, 1985, the stock purchase agreements involving M & D were consummated, with the result that between them Central Transport and GLS Leasco purchased 100% of M & D's common stock.
 
 
 4
 On March 29, 1984, soon after Centra took control, M & D instituted Chapter 11 reorganization proceedings in the United States Bankruptcy Court for the Middle District of North Carolina. Prior to filing its petition, M & D had operated both a General Commodities Division and a Special Commodities Division within the Pension Fund's jurisdiction, and had contributed to the Pension Fund on behalf of employees in both divisions. As the result of a strike, however, M & D terminated the operations of the more profitable General Commodities Division and operated only the Special Commodities Division after December 7, 1984. The termination of the General Commodities Division caused M & D to reduce its contributions to the Pension Fund significantly in 1985, 1986, and 1987.
 
 
 5
 In the belief that M & D would suffer a complete withdrawal from the fund,[1] the Pension Fund on April 14, 1984 filed the first of a series of contingent and, later, fixed proofs of claim with the bankruptcy court. When M & D in fact continued its contributions, but on a reduced basis, the Pension Fund filed subsequent contingent claims for partial withdrawal under ERISA. The Pension Fund's second amended fixed proof of claim, filed April 3, 1989, asserted that the anticipated partial withdrawal had occurred as of December 31, 1987, and that M & D was therefore indebted to the Pension Fund for partial withdrawal liability in the amount of $247,172.98.
 
 
 6
 On March 29, 1986, the bankruptcy court confirmed the M & D reorganization plan. See In re Mason & Dixon Lines, Inc., 63 B.R. 176 (Bankr.M.D.N.C.1986). The plan called for the cancellation of all of M & D's outstanding common stock and an issue of new common stock to CenTra, Inc., the principal corporation which owned Central Transport and GLS Leasco, in exchange for a capital contribution of $1 million. New preferred stock was to be issued to all unsecured creditors, with each creditor receiving preferred stock having a par value equal to the amount of the unsecured claim. The unsecured creditors were divided into two classes: Class 7, consisting of pension plans having withdrawal liability claims, including appellee Pension Fund; and Class 6, consisting of all other unsecured creditors.
 
 
 7
 The plan established a liquidation preference for the preferred stock and provided for its mandatory redemption 20 years after issuance at par value. During the 20 years, however, preferred stockholders were to have no voting rights and receive no dividends. Class 6 creditors would be able to redeem their stock (Series 1) immediately at 10% of its stated value up to $20 million, because of an offer to purchase this stock submitted by the R-100 Corp., a non-party. The remaining preferred stockholders, Class 7, held Series 2 preferred which was not included in R-100's offer. Therefore, the Class 7 stockholders could not redeem immediately but would be forced to wait for 20 years. Over Class 7 stockholders' objection to the plan, the bankruptcy court confirmed it as meeting the requirements of 11 U.S.C. § 1129(a)(8).[2] The plan became effective April 9, 1986.[3]
 
 
 8
 On May 9, 1989, soon after the Pension Fund had filed its second amended proof of claim and in accordance with the statutory procedures outlined in the MPPAA,[4] the Fund issued a partial withdrawal liability assessment and demand against Centra in the amount of $247,170. This assessment asserted that Centra and M & D were members of a "control group" and thus were jointly and severally liable under 29 U.S.C. § 1301(b)(1) for any withdrawal liability generated by M & D's actions. Citing the authority of MPPAA § 1399(c)(2), the Pension Fund demanded that Centra pay this liability in a lump sum or in 12 monthly installments of $21,067, beginning no later than 60 days after the date of the demand.
 
 
 9
 Centra then invoked the MPPAA dispute resolution procedures by requesting Pension Fund review of the withdrawal liability assessment. When the Pension Fund affirmed its initial assessment, Centra instituted arbitration proceedings contesting the Pension Fund's assessment. Meanwhile, Centra made no interim payments on the withdrawal liability assessment.
 
 
 10
 The Pension Fund filed an action in the United States District Court for the Eastern District of Virginia at Richmond, seeking to compel Centra to make interim payments as required by 29 U.S.C. § 1399(c)(2). Centra counterclaimed, requesting declaratory and injunctive relief against arbitration and the payment of interim withdrawal liability. Acting on the basis of a stipulated record, the district court denied Centra's requested relief and granted summary judgment for the Pension Fund. The court held that the defenses Centra advanced to arbitration of its withdrawal liability must be submitted to arbitration, and that Centra was delinquent in its obligation to pay the assessed withdrawal liability. The court ruled that the Pension Fund was entitled to the unpaid contributions with interest, liquidated damages in the amount of 20 per cent of the unpaid contributions, and attorneys' fees and costs. Centra appealed to this court.
 
 
 11
 We review summary judgments de novo on appeal. Higgins v. E.I. DuPont De Nemours & Co., 863 F.2d 1162, 1166-67 (4th Cir.1988); Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1127-28 (4th Cir.1987). Summary judgment is appropriate in cases where there is no genuine dispute as to a material fact, and where it appears that the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(d); Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). Summary judgment should be granted only in those cases where it is perfectly clear that no issue of fact is involved and inquiry into the facts is not desirable to clarify the application of the law. Charbonnages De France v. Smith, 597 F.2d 406, 414 (4th Cir.1979); Stevens v. Howard D. Johnson Co., 181 F.2d 390, 394 (4th Cir.1950).
 
 
 12
 On summary judgment, any permissible inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587-88, 106 S.Ct. 1348, 1356-57, 89 L.Ed.2d 538 (1986). However, where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, disposition by summary judgment is appropriate. Id. at 587, 106 S.Ct. at 1356; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49, 106 S.Ct. 2505, 2510-11, 91 L.Ed.2d 202 (1986).
 
 II.
 
 13
 In disputing its withdrawal liability to the Pension Fund, Centra makes two related claims: (1) that M & D was the only source of Centra's liability to the Fund, and that therefore M & D's discharge in bankruptcy also discharged Centra; and (2) that Centra was not an "employer" for MPPAA purposes because Centra purchased the stock of the reorganized debtor M & D after confirmation of the plan, free and clear of all pre-confirmation liability. We find that the district court correctly determined that summary judgment was appropriate in the light of the statutory directive that claims such as these, which raise issues concerning the Pension Fund's determinations concerning withdrawal liability, are subject to mandatory arbitration and thus are not cognizable in the Pension Fund's action to compel interim withdrawal payments. 29 U.S.C.A. § 1401(a)(1) (1985).
 
 
 14
 When the sponsors of a multi-employer pension fund issue a withdrawal liability assessment to an employer pursuant to 29 U.S.C. § 1399(b)(1), the MPPAA requires that such withdrawal liability
 
 
 15
 ... shall be payable in accordance with the schedule set forth by the plan sponsor ... beginning no later than 60 days after the date of the demand notwithstanding any request for review or appeal....
 
 
 16
 29 U.S.C.A. § 1399(c)(2) (1985) (emphasis added). If the employer wishes to challenge the sponsors' determinations, the Act further provides that
 
 
 17
 [a]ny dispute between an employer and the plan sponsor ... concerning a determination made under sections 1381 through 1399 of this title shall be resolved through arbitration.
 
 
 18
 29 U.S.C.A. § 1401(a)(1) (1985).
 
 
 19
 As many courts have noted, this statutory scheme unambiguously established a "pay now, dispute later" dispute resolution procedure designed to protect the financial stability of multi-employer pension plans from unnecessary risk caused by protracted delay in the collection of withdrawal liability payments. See, e.g., Debreceni v. Merchants Terminal Corp., 889 F.2d 1, 5 (1st Cir.1989); Robbins v. Pepsi-Cola Metropolitan Bottling Co., 637 F.Supp. 1014, 1018 (N.D.Ill.1986), aff'd, 800 F.2d 641 (7th Cir.1986). Courts in the majority of circuits have held that ERISA empowers a court to order the making of interim withdrawal liability payments. Debreceni, supra; Robbins v. Pepsi-Cola, supra; Marvin Hayes Lines, Inc. v. Central States, Southeast & Southwest Areas Pension Fund, 814 F.2d 297, 299 (6th Cir.1987); United Retail & Wholesale Employees Teamsters Union Local No. 115 Pension Plan v. Yahn & McDonnell, Inc., 787 F.2d 128, 134 (3d Cir.1986), aff'd mem., 481 U.S. 735, 107 S.Ct. 2171, 95 L.Ed.2d 692 (1987); Trustees of Amalgamated Ins. Fund v. Geltman Indus. Inc., 784 F.2d 926, 931 (9th Cir.1986), cert. denied, 479 U.S. 822, 107 S.Ct. 90, 93 L.Ed.2d 42 (1986); Trustees of the Retirement Fund of the Fur Manufacturing Industry v. Lazar-Wisotzky, Inc., 550 F.Supp. 35, 38 (S.D.N.Y.1982), aff'd, 738 F.2d 419 (2d Cir.1984). Generally, courts have allowed an exception to the statutory directive only where an employer makes a facial constitutional attack or shows that irreparable injury will result from being forced to make the interim payments. See, e.g., McDonald v. Centra, 118 B.R. 903, 922 (D.Md.1990); Flying Tiger Line v. Teamsters Pension Trust Fund of Philadelphia, 830 F.2d 1241, 1249 (3d Cir.1987). The burden of qualifying for this exception, however, is extremely high, for the MPPAA provides adequate safeguards to ensure that an employer will promptly recover any overpayment in the lump sum with interest. See Connors v. Brady-Cline Coal Co., 668 F.Supp. 5, 8 (D.D.C.1987) (enforcing interim withdrawal payments despite employer's claim that making interim payments would force it to cease operations); Robbins v. Pepsi-Cola, supra, 637 F.Supp. at 1020 (citing necessity for employer to demonstrate that making of interim payments would bankrupt it or leave it on the brink of financial ruin).
 
 
 20
 In this case, Centra makes no assertion that irreparable injury would follow upon the imposition of withdrawal liability. Rather, Centra claims that M & D was the statutory "employer," and that M & D's withdrawal liability, discharged in bankruptcy, cannot be transferred to Centra because Centra purchased the stock of the reorganized M & D after confirmation of the Chapter 11 reorganization plan. This argument is insufficient to suspend Centra's statutory duty to make interim withdrawal payments as assessed by the Pension Fund.
 
 
 21
 The MPPAA's definition of an "employer" encompasses not merely the entity making contributions to the pension plan, but all "trades and businesses" that are under "common control" along with that entity. 29 U.S.C.A. § 1301(b)(1) (West Supp.1990).[5] It is established law that each member of a control group is jointly and severally liable under ERISA for withdrawal liability generated by any member's activities. See, e.g., Board of Trustees of Western Teamsters Pension Trust Fund v. LaFrenz, 837 F.2d 892, 893 (9th Cir.1988); IUE AFL-CIO Pension Fund v. Barker & Williamson, Inc., 788 F.2d 118, 130 (3d Cir.1986); McDonald v. Centra, supra, 118 B.R. at 914.
 
 
 22
 Centra concedes that it has been a member of a control group with M & D since its 1986 acquisition of the reorganized M & D's stock. Moreover, Centra stipulated that, through its subsidiaries, it owned 100% of M & D's common stock from February 2, 1985 to date, and that it possessed the exclusive right to acquire this stock since November 29, 1983. The bankruptcy court found, and Centra did not dispute, that Centra had already assumed operational control of M & D as of the date of M & D's filing of its bankruptcy petition. In the light of these facts, it is clear that Centra's membership in the control group antedated its post-confirmation stock purchase. See Trustees of the Chicago Truck Drivers, Helpers and Warehouse Workers Union Pension Fund v. Central Transport, Inc., et al., No. 86-C-6224 (N.D.Ill. July 22, 1988), 1988 WL 79583, vacated on other grounds, 888 F.2d 1161 (1989) (in action to enforce withdrawal liability against Centra by another pension fund, court held that "[t]he undisputed facts demonstrate beyond question that defendants [Centra] and Mason/Dixon Truck Lines were members of a controlled group of corporations.").
 
 
 23
 Centra claims that its purchase of the reorganized M & D's stock created a new and separate ownership history sufficient to relieve Centra of M & D's pre-confirmation withdrawal liability. This assertion is not credible, in view of the fact that Centra, through its subsidiaries, controlled M & D before the reorganization, and Centra, by direct ownership of the stock, continued to control M & D after the reorganization. As long as Centra was a control group member with M & D when M & D withdrew from the Pension Fund, Centra is jointly and severally liable on the withdrawal obligation. See Connors v. Brady-Cline Coal Co., 668 F.Supp. 5, 9 (D.D.C.1987).
 
 
 24
 Centra also points to the fact that the stock repurchase agreement provided the option for sale to a third party, a non-control group member not subject to the control group's liabilities, as reason to extend the same liability discharge to Centra. It is true that Congress indicated that the sale of a control group's interest to an unrelated party terminates the control group as to the selling group member.[6] Nevertheless, that fact is irrelevant when the sale is to a control group member. Control group members are plainly liable for withdrawal liability of other members. See Chicago Truck Drivers, supra, 1988 WL 79583 (finding Centra liable for M & D's withdrawal liability); McDonald v. Centra, supra, 118 B.R. at 914 (likewise); Pension Benefit Guaranty Corp. v. Ouimet, 470 F.Supp. 945, 950-53 (D.Mass.2979), aff'd, 630 F.2d 4 (1st Cir.1980), cert. denied, 450 U.S. 914, 101 S.Ct. 1356, 67 L.Ed.2d 339 (1981).
 
 
 25
 Finally, Centra's claim that M & D's discharge in bankruptcy absolved Centra of its withdrawal liability is meritless. The bankruptcy court's order confirming the reorganization plan provides discharge only as to M & D. The law is clear that discharge of a debtor does not affect the liability on the debt of any co-debtors. 11 U.S.C.A. § 524(e) (1979); In re Sago Palms Joint Venture, 39 B.R. 9, 9-10 (Bankr.S.D.Fla.1984) (setting aside provision of plan purporting to release liabilities of the principals of debtor corporation as "directly contrary to the provisions of 11 U.S.C. § 524(e)."). The cases Centra cites in support of its position that M & D's withdrawal liability is a pre-confirmation debt of which it is relieved are inapposite, for they involve actions against the debtor itself rather than against a co-debtor. See In re Pulaski Highway Express, Inc., 57 B.R. 502 (Bankr.M.D.Tenn.1986); In re Art Shirt, Ltd., 93 B.R. 333 (Bankr.E.D.Pa.1988).
 
 
 26
 Moreover, it has been held in the ERISA context that the bankruptcy of one control group member cannot be used to offset or reduce the joint and several obligations of other members of the control group. Pension Benefit Guaranty Corp. v. Ouimet Corp., 711 F.2d 1085, 1090 (1st Cir.), cert. denied, 464 U.S. 961, 104 S.Ct. 393, 78 L.Ed.2d 337 (1983) (holding that the statute places the control group in the shoes of the withdrawing bankrupt employer). The Ouimet court's holding that solvent members of the control group to which the terminating bankrupt employer belonged were to bear the responsibility for that employer's withdrawal liability was based on its understanding of "the congressional intent of holding employers accountable for the pension benefits they promise to ensure that employees can safely rely on these promises in their retirement planning." 711 F.2d at 1092. See also Mason & Dixon Tank Lines, Inc. v. Central States, Southeast & Southwest Areas Pension Fund, 852 F.2d 156, 163 (6th Cir.1988) (affirming district court's conclusion that Tank Lines, a member of the Centra control group, could not benefit from M & D's discharge of liability in bankruptcy); Chicago Truck Drivers, supra, 1988 WL 79583 (holding that Centra was not entitled to the shield of M & D's bankruptcy).
 
 
 27
 Addressing a similar argument by Centra, the district court in McDonald v. Centra, supra, responded:
 
 
 28
 To accept Defendants' arguments would be to turn the concept of a commonly controlled group and attendant joint and several liability on its head and allow it to be used as a shield against liability rather than a tool with which pension plan sponsors may recover withdrawal liability due and owing a plan.
 
 
 29
 118 B.R. at 926. The district court held that M & D's insolvency had no bearing on Centra's liability, stating:
 
 
 30
 Once found liable as a "single employer," the corporate defendant cannot evade judgment by shifting its assets to its back pockets while pleading inability to pay because of its empty front pockets.
 
 
 31
 118 B.R. at 927. Accord I.A.M. National Pension Fund v. Slyman Industries, 901 F.2d 127, 129 (D.C.Cir.1990).
 
 III.
 
 32
 Although Centra initiated arbitration with the Pension Fund under the MPPAA, it now seeks to enjoin further arbitration, claiming that the issue of whether it is an "employer" for withdrawal liability purposes is a matter of statutory interpretation which must be settled by the district court rather than in arbitration.
 
 
 33
 Courts have treated § 1401(a)'s direction to "arbitrate first" as a general command; nevertheless, they have usually refrained from interpreting § 1401(a) as an absolute jurisdictional bar. Rather, § 1401(a) has generally been regarded as an "exhaustion of administrative remedies" requirement. See, e.g., I.A.M. National Pension Fund v. Clinton Engines Corp., 825 F.2d 415, 417 (D.C.Cir.1987); Mason & Dixon Tank Lines, supra, 852 F.2d at 163. But see McDonald v. Centra, supra, 118 B.R. at 916 (holding that administrative exhaustion jurisprudence is inappropriate in construing the arbitral provisions of the MPPAA; they should be construed as a jurisdictional prerequisite). Because Congress in Section 1401(a) did not state in "clear, unequivocal terms that the judiciary is barred from hearing an action until the administrative agency has come to a decision," federal courts have intervened to take jurisdiction prior to arbitration in the rare case where the defendant has raised a legitimate legal question of statutory interpretation which must be resolved in order to ascertain whether the statutory scheme applies to that defendant at all. 825 F.2d at 417 (quoting I.A.M. National Pension Fund Benefit Plan C v. Stockton TRI Industries, 727 F.2d 1204, 1208 (D.C.Cir.1984)).
 
 
 34
 However, this limited exception to the statutory arbitration command has been found applicable only in cases where the employer claims that it did not become an employer for MPPAA purposes in time to acquire withdrawal liability, or where the employer asserts that it was never an MPPAA employer and thus is not subject to ERISA's dispute resolution procedures. Flying Tiger, supra, 830 F.2d at 1250-51; Banner Industries, supra, 875 F.2d at 1291. The district court, ruling on stipulated facts, found that Centra had been a control group member since, if not earlier, at least February 2, 1985--prior to M & D's discharge by reorganization in March 1986 and M & D's withdrawal in December 1987. Thus, Centra's claim can only be that, by virtue of a new and separate ownership history arising from the stock repurchase in 1985, it ceased to be an MPPAA employer in time to avoid liability for M & D's withdrawal. This argument fails in the light of the holding that, as long as a withdrawing entity was a part of the control group of an employer subject to the MPPAA at some point in time, and where the issues in dispute fall under provisions explicitly designated for arbitration, the arbitration procedure must be followed. Flying Tiger, supra, 830 F.2d at 1247 (emphasis added); accord Banner Industries v. Central States Pension Fund, 875 F.2d 1285, 1292 (7th Cir.1989).
 
 
 35
 Even assuming that such a claim were cognizable, it would unavoidably implicate the issue of whether the stock repurchase transaction was designed at least in part to avoid withdrawal liability on the part of Centra. 29 U.S.C.A. § 1392(c) (1985). The question is then not merely the arguably purely legal one of whether Centra is an "employer" defined by the statute. The factual determinations that must be made in order to resolve this issue require that it be arbitrated. See 29 U.S.C.A. § 1401(a) (1985) (requiring arbitration of disputes over determinations under MPPAA §§ 4210 through 4219, 29 U.S.C. §§ 1381-1399). See also Flying Tiger, supra, 830 F.2d at 1250.
 
 
 36
 Moreover, with increasing judicial awareness of the legitimacy and competency of arbitration as a viable forum for legal as well as factual matters, a number of courts have held that even questions of statutory interpretation, standing alone, are not exempt from arbitration under the MPPAA. As the District of Columbia Circuit has stated:
 
 
 37
 From the unambiguous language by which Congress established the primacy of arbitration in withdrawal liability disputes and in light of our decisions interpreting those terms, it should be beyond cavil that the existence of an issue of statutory interpretation, standing alone, does not justify bypassing arbitration.
 
 
 38
 Clinton Engines, supra, 825 F.2d at 417. Accord Mason & Dixon Tank Lines, supra, 852 F.2d at 164; Teamsters Pension Trust Fund v. Allyn Transportation Co., 832 F.2d 502, 504-05 (9th Cir.1987); McDonald v. Centra, supra, 118 B.R. at 921-22. Such a position accords with the view that because ERISA/MPPAA are remedial statutes, they should be liberally construed in favor of protecting the participants in employee benefits plans. ILGWU National Retirement Fund v. Levy Bros. Frocks, Inc., 846 F.2d 879, 885 (2d Cir.1988) (quoting IUE AFL-CIO Pension Fund v. Barker & Williamson, Inc., 788 F.2d 118, 127 (3d Cir.1986).
 
 
 39
 Accepting this action as a good faith threshold questioning of whether the statute applies is difficult, when Centra previously acknowledged the MPPAA's jurisdiction by invoking arbitration. Centra's defenses appear to be rather an attempt to "stylize [Centra's] claim into a question of law" with the purpose of delaying if not altogether preventing further arbitration. Connors, supra, 668 F.Supp. at 7.
 
 
 40
 We find that the district court properly applied the law in compelling Centra to make interim withdrawal liability payments during the pending arbitration. Therefore, the court's granting of summary judgment to the Pension Fund is
 
 
 41
 AFFIRMED.
 
 
 
 [1]
 In 1980 Congress amended ERISA by means of the Multiemployer Pension Plan Amendments Act ("MPPAA"), 29 U.S.C. §§ 1381 et seq., to protect beneficiaries of multi-employer pension plans from the effects of the withdrawal of a contributing employer. Under the MPPAA, an employer who withdraws from an ongoing multi-employer pension plan becomes absolutely liable on the date of withdrawal for a proportionate share of the plan's unfunded vested liability. A complete withdrawal occurs when an employer permanently ceases to have an obligation to contribute under the plan, or permanently ceases all covered operations under the plan. 29 U.S.C.A. § 1383(a) (1985). Partial withdrawal results when there is a 70% contribution decline, or a partial cessation of the employer's contribution obligation. 29 U.S.C.A. § 1385(a) (1985)
 
 
 [2]
 11 U.S.C. § 1129(a)(8) provides that if a class of claims or interests has not accepted the plan, the bankruptcy court shall not approve the plan unless it ascertains that the objecting class is not impaired by the plan. 11 U.S.C.A. § 1129(a)(8) (1979 & West Supp.1991)
 
 
 [3]
 The bankruptcy court stayed its order conditioned upon the Pension Fund's posting a $7 million supersedeas bond. The Pension Fund did not post the bond, so implementation of the plan began on April 9, 1986. Meanwhile, the Pension Fund sought review in federal district court of the confirmation plan itself. Central States, Southeast and Southwest Areas Pension Fund v. Central Transport, Inc., 68 B.R. 95 (Bankr.M.D.N.C.1986). The district court dismissed the appeal on the ground that it had become moot by reason of substantial implementation of the reorganization plan. The Fourth Circuit affirmed. Central States, Southeast and Southwest Areas Pension Fund v. Central Transport, Inc., 841 F.2d 92 (4th Cir.1988)
 
 
 [4]
 The MPPAA contains detailed dispute resolution provisions. Once the plan sponsors determine that an employer has completely or partially withdrawn from a pension plan, they must notify the employer of the amount of the liability, prepare a schedule for liability payments, and demand payment in accordance with the schedule. 29 U.S.C.A. §§ 1382, 1399(b)(1) (1985). Within 90 days after receiving notice, the employer may ask the plan sponsors to review any specific matter relating to the determination of liability and the schedule of payments. Id. at § 1399(b)(2)(A). After reasonable review of any matter raised, the plan sponsors must then notify the employer of their decision. Id. at § 1399(b)(2)(B). If either party disputes the outcome, Section 1401(a)(1) requires that "[a]ny dispute between an employer and the plan sponsor of a multiemployer plan concerning a determination made under sections 1381 through 1399 of this title shall be resolved through arbitration." After arbitration proceedings are completed, any party may within 30 days bring an action in federal district court to enforce, vacate, or modify the arbitrator's award. Id. at § 1401(b)(2). Interim payments of withdrawal liability must be made to the plan during the pendency of any dispute. Id. at §§ 1399(c)(2), 1401(d)
 
 
 [5]
 Section 1301(b) further states that the implementing regulations which are to be developed by the Pension Benefit Guaranty Corporation (PBGC) are to be consistent and coextensive with regulations promulgated by the Treasury Department under 26 U.S.C. § 414(c) that define "trades or businesses under common control." Because the PBGC has not yet issued regulations on the matter, courts apply the relevant Treasury Department regulations when discussing common control. These regulations, in pertinent part, amplify the meaning of common control as follows:
 [T]he term "two or more trades or businesses under common control" means any group of trades or businesses which is either a "parent-subsidiary group of trades or businesses under common control" ... a "brother-sister group of trades or businesses under common control" ... or a "combined group of trades or businesses under common control"....
 
 
 [26]
 C.F.R. § 1.414(c)-2(a) (1990)
 (1) The term "parent-subsidiary group" ... means one or more chains of organizations conducting trades or businesses connected through ownership of a controlling interest with a common parent organization if--
 (i) A controlling interest in each of the organizations, except the common parent organization, is owned by one or more of the other organizations; and (ii) The common parent organization owns a controlling interest in at least one of the other organizations, excluding, in computing such controlling interest, any direct ownership in interest by such other organizations.
 (2) Controlling interest defined--
 (A) In the case of an organization which is a corporation, ownership of stock possessing at least 80 percent of the total combined voting power of all classes of stock entitled to vote of such corporation or at least 80 percent of the total value of shares of all classes of stock of such corporation.
 
 
 [26]
 C.F.R. § 1.414(c)-2(b) (1990)
 
 
 [6]
 The legislative history contains the following hypothetical illustrating this point:
 [I]f P Corporation owns 100 percent of the stock of S Corporation, a subsidiary that has an obligation to contribute to a multi-employer plan on behalf of its employees, the controlled group consisting of P and S would be considered an employer with an obligation to contribute to the plan. If P sells all of its interest in S to an unrelated party, the controlled group consisting of P and S would cease to exist.
 H.R.Rep. No. 96-869, Part II, 96th Cong., 2d Sess. 16, reprinted in 1980 U.S.Code Cong. & Admin.News 2918, 2993, 3005-06.