Joseph CONNORS, et al., Plaintiffs,

v.

PAYBRA MINING CO.,
et al., Defendants.

Civ. A. No. 2:90–1061.

United States District Court,
S.D. West Virginia,
Charleston Division.

Dec. 1, 1992.

Gary A. Collias, McIntyre, Haviland &
Jordan, Charleston, WV, David W. Allen,
Margaret M. Topps, Kenneth M. Johnson,
UMWA Health & Retirement Funds, Office
of Gen. Counsel, Washington, DC, Stacy A.
Hickox, Knoxville, TN, for plaintiffs.

Christopher S. Smith, Hoyer, Hoyer & Smith, Charleston, WV, Richard A. Seyer, William H. Howe, Mary Lou Smith, Howe, Anderson & Seyer, Washington, DC, Angus E. Peyton, Brown & Peyton, Charleston, WV, for defendants.

Mark E. Heath, Anna M. Dailey, Smith, Heenan & Althen, Charleston, WV, for interested parties.

## MEMORANDUM OPINION AND ORDER

HADEN, Chief Judge.

Pending are the parties cross motions for summary judgment. The Court partially GRANTS the Plaintiffs' motion for summary judgment and DENIES the Defendants' motions for summary judgment. The case will proceed to trial to resolve the remaining issues of material fact.

Under *Rule* 56(e), Federal Rules of Civil Procedure, summary judgment is proper only:

"[I]f the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law."

A principal purpose of summary judgment is to isolate and dispose of meritless litigation. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The party moving for summary judgment has the burden to show initially the absence of a genuine issue concerning any material fact. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 159, 90 S.Ct. 1598, 1609, 26 L.Ed.2d 142 (1970). However, once the moving party has met its initial burden, the burden shifts to the nonmoving party to "establish the existence of an element essential to that party's case, and on which that party will bear

the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. at 322, 106 S.Ct. at 2552. To discharge this burden, the nonmoving party cannot rely on its pleadings, but instead must have evidence showing that there is a genuine issue for trial. *Id.* at 324, 106 S.Ct. at 2553.

A full discussion of the facts is unnecessary. Detailed facts are adequately set forth in the parties memoranda and supporting materials spanning some six to seven thousand pages. The Court will explicate only the undisputed facts necessary to support its rulings.

### A. Individual Liability of Defendants Jack R. Robertson and Joe C. Ferrell

The corporate coal company Defendants in this case are Ro–Fer & Associates, Inc. (Ro–Fer), Paybra Mining Company, Inc. (Paybra), Jovic Mining Company, Inc. (Jovic), and Steam Coal Sales, Inc. (Steam). Defendants Robertson and Ferrell (Defendants or individual Defendants) were the officers, directors, and sole shareholders [1] of the four corporate coal company Defendants. These corporate Defendants signed certain National Bituminous Coal Wage Agreements (NBCWAs or Agreements). Some of these Agreements were "standard" while others were "modified." [2] The signatories to the different Agreements are as follows:

1. Ro–Fer—1981 contract—standard, 1984 contract—standard, 1988 contract—standard;

2. Paybra—1984 contract—modified, 1988 contract—standard;

3. Jovic—1984 contract—modified, 1988 contract—standard; and

4. Steam—1988 contract—modified.

All Agreements provide for the corporate Defendants' contributions to certain em-

---

**1.** While members of the individual Defendants' families did hold shares in Defendant Ro–Fer, such fact is immaterial to the instant discussion.

**2.** A modified NBCWA is a waiver of certain terms of the standard NBCWA that is granted to an operator. For instance, Paybra was signatory to a modified 1984 NBCWA which permitted it to contribute ten cents per ton to the 1950

Pension Trust rather than the standard $1.11 per ton. The Plaintiffs dispute the effectiveness of such waivers because such were granted by the UMWA and not the Plaintiffs. The ability of the UMWA to grant such waivers is the subject of protracted litigation. *See* Pls.' Reply Mem. at 17 n. 11. The modified/standard distinction is, again, immaterial to the issue under consideration.

ployee pension and health benefit trusts (Funds). These Agreements contain the following language describing the character of contributions to the Funds:

> Title to all the monies paid into and/or due and owing to the Trusts specified in this Article shall be vested in and remain exclusively in the Trustees of those Trusts.[3]

National Bituminous Coal Wage Agreement of 1981, June 7, 1981, art. XX(d)(8); National Bituminous Coal Wage Agreement of 1984, Oct. 1, 1984, art. XX(d)(9); National Bituminous Coal Wage Agreement of 1988, Feb. 1, 1988, art. XX(d)(9). The Plaintiffs seek to collect certain due and owing contributions of the corporate coal company Defendants and assert that all of the Defendant are jointly liable for such.

The individual Defendants exercised broad personal discretion and control over the assets and spending practices of the corporate Defendants. The deposition testimony of these individuals is illustrative. Mr. Robertson testified as follows:

> Q: Who made the decisions on which bills to pay and which bills not to pay for Jovic at that point?
>
> . . . .
>
> A: Mr. Ferrell and I would look at it and, you know, you decide between roof bolts and paying the trucker versus something else that was not as important to the day-to-day operation of the mines, that is what we would pay.
>
> Q: So if it was between roof bolts and the Funds, roof bolts come [sic] first?
>
> A: Yeah. . . .
>
> . . . .
>
> Q: So was part of this money Paybra was using to build the infrastructure over at Coal Mountain money that Paybra wasn't paying into the Funds?
>
> A: Exactly.

**3.** The parties do not assert that this language was affected by the modified agreements set forth above. The Court therefore concludes, as supported by the record, that such modifications only dealt with the level of contributions to be paid.

**4.** Mr. Hall was extensively involved in the Defendants' financial operations:

. . . .

> Q: So during this whole period, let's just go from late '87 up until the present, who would make decisions on which bills to pay and which bills not to pay?
>
> . . . .
>
> A: Mr. Ferrell and I had to. We had to make that decision, yes.

(Robertson Dep. at 118–19, 156–57, 181–83).

Mr. Ferrell's testimony on discretionary spending decisions proceeded along the same lines:

> Q: During the '87 or '88 period, who was responsible for making decisions on which creditors to pay for Jovic?
>
> A: That was handled in the office. [The office manager] Jack [Robertson] and myself.
>
> . . . .
>
> Q: At the Coal Mountain site, who had responsibility for paying the Funds?
>
> A: It was the CPAs and [me and Mr. Robertson].

(Ferrell Dep. at 48, 66).

Glenn T. Hall was the certified public accountant who performed the primary bookkeeping services for the corporate Defendants.[4] His testimony also indicates who controlled the financial decisions for the corporate Defendants:

> Q: Who would make the decision on whether Jovic or any other corporation would pay this bill?
>
> A: The ultimate decision on paying bills would be made by Jack Robertson or Joe Ferrell.
>
> . . . .
>
> Q: So who's responsible for making contributions to the Funds at Jovic?
>
> A: The officers, Jack Robertson and Joe Ferrell.
>
> . . . .

> Q: Were you on that account?
> A: Yes, I was. At some point in time all of the accounting work for each of the companies that Jack Robertson was involved in was transferred to my supervision as the partner in charge, but not initially.

Hall Dep. at 12–13.

Q: Who would decide which of those bills were being delayed to pay?

A: Jack Robertson and Joe Ferrell.

Q: So basically, money that would otherwise be going to the Funds or, in your testimony, to other creditors by Paybra was used, one, to keep things operating at Jovic and, two, to invest in infrastructure of Coal Mountain.

A: Yes....

(Hall Dep. at 22, 57, 69–70).

The record provides further examples[5] and admissions illustrating the same point: The spending decisions of the corporate Defendants were made by the individual Defendants.[6] The Plaintiffs contend that these decisions, combined with the NBCWA clause set out above, make the individual Defendants liable as "fiduciaries" under the Employee Retirement Income Security Act (ERISA) for the contributions owed by the corporate Defendants.[7]

ERISA defines the term fiduciary as follows:

> a person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan *or exercises any authority or control respecting management or disposition of its assets.*

ERISA, § 3(21)(A), 29 U.S.C. § 1002(21)(A) (emphasis added).

A fiduciary must "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries." 29 U.S.C. § 1104(a)(1). Congress intended a broad and flexible definition of the term "fiduciary" in § 1002(21)(A). S.Rep. No. 127, 93rd Cong., 2d Sess. 27, *reprinted in* 1974 U.S.C.C.A.N. 4639, 4838, 4864–4865 ("A fiduciary is one who occupies a position of confidence or trust. As defined by the amendments, a fiduciary is a person who exercises any power of control, management or disposition with respect to monies or other property of an employee benefit fund"); *Blatt v. Marshall,* 812 F.2d 810, 812 (2d Cir.1987). Further, the remedial nature of ERISA as a whole dictates that it should be liberally construed to protect participants in employee benefit plans. *Teamsters Joint Council No. 83 v. Centra, Inc.,* 947 F.2d 115, 123 (4th Cir.1991). Employers, however, generally have not been held liable as ERISA fiduciaries for delinquent contributions to a multiemployer pension plan. *Cf. Sutton v. Weirton Steel Div. of Nat. Steel Corp.,* 724 F.2d 406, 411 (4th Cir.1983) (employer not treated under fiduciary standards when it amends or alters provisions of an unfunded contingent benefits plan payable before retirement); *Galgay v. Gangloff,* 677 F.Supp. 295, 301 (M.D.Pa.1987), *aff'd,* 932 F.2d 959 (3rd Cir. 1991). The question for the Court is whether this general rule is altered by the "due and owing" language of the relevant NBCWAs. For reasons which follow, the Court concludes that the contractual language warrants a departure from the general rule.

5. *See, e.g.,* Hall Dep. at 111–12; Collins Dep. II at 9–12.

6. Such spending decisions were apparently not limited to the corporations' expenses. The record contains a stipulation by the parties that the individual Defendants' wives and children received compensation from certain corporate Defendants without ever performing any services. When Defendant Ferrell was asked why the corporations would make such payments to his daughter, he stated "She might have had to pay taxes. She might want to buy clothes. I don't know. It was just for using for household reasons." Ferrell Dep. at 211. Defendant Robertson testified that in 1987 the corporate Defendants purchased Robertson's daughter a Porsche which was later traded for a Nissan 300ZX. Robertson Dep. at 197–99.

The individual Defendants state that such expenditures were either characterized as personal on IRS Form 1099s or simply charged to the individual Defendants as additional compensation. The Court notes that some 1099s appear to be lacking, and the level of compensation received by the individual Defendants seems excessive. Whatever other conclusions might be drawn from these facts, they certainly buttress the conclusion that the individual Defendants exercised absolute, unfettered personal discretion as to the corporate Defendants' expenditures.

7. The Defendants apparently concede that the Funds are covered by the relevant provisions of ERISA. Defs.' Answer to Pls.' Second Am. Compl. at 3–4. Accordingly, the Court will not address this issue.

■ There is a paucity of authority on the effect the NBCWA "due and owing" clause has on a signatory's ERISA fiduciary status. To establish fiduciary liability under ERISA, the Plaintiffs must first show that the individual Defendants meet the fiduciary definition of § 1002(21)(A). This definition requires (1) a showing that plan assets are at issue and (2) that the individual in question exercised authority or control relating to the management or disposition of such assets. Second, it must be shown that the putative fiduciary breached his or her fiduciary duty as to the plan assets.

The first question to address is whether the corporate Defendants' due and owing contributions constitute plan assets. The court in *Galgay*, 677 F.Supp. at 301, was presented with a provision of the Anthracite Wage Agreement which is virtually identical to the NBCWA language at issue. The court held that the unambiguous language of the agreement made the defendants' unpaid contributions "vested assets of the plaintiff fund," and axiomatically, plan assets. *Id.* at 302. The plain language of the clause at issue dictates the same result:

> *Title to all the monies* paid into *and/or due and owing* to the Trusts specified in this Article *shall be vested in and remain exclusively in the Trustees* of those Trusts.

Little analysis is necessary to conclude that since the applicable NBCWA language vests title in the Trustees of due and owing contributions, such outstanding or withheld contributions constitute plan assets.[8]

■ The next inquiry under the definition is whether the individual Defendants "exercise[d] any authority or control respecting management or disposition of" these plan assets. Again, the individual Defendants' respective admissions illustrate that contributions due and owing the Funds were withheld and directed elsewhere and such spending decisions were the personal, conscious choices of these Defendants:

Q: So if it was between roof bolts and the Funds, roof bolts come [sic] first?

A: Yeah....

Q: So was part of this money Paybra was using to build the infrastructure over at Coal Mountain money that Paybra wasn't paying into the Funds?

A: Exactly.

Q: During the '87 or '88 period, who was responsible for making decisions on which creditors to pay for Jovic?

A: That was handled in the office. [The office manager] Jack [Robertson] and myself.

Once contributions become due and owing, they become plan assets. The above admissions, with others in the record, demonstrate that the individual Defendants personally "exercise[d] ... authority or control respecting management or disposition of" these assets. As a result, the individual Defendants come within the ERISA definition of fiduciary.

■ Finally, the Court must address whether the individual Defendants breached their fiduciary duties. The Defendants' admissions clearly demonstrate a breach. Fund assets, in the form of due and owing contributions, were either diverted for other purposes or simply not paid as a result of the individual Defendants' personal, discretionary control and management of such. Because the individual Defendants failed to act "solely in the interest of the participants and beneficiaries" of the Fund, the Court thus concludes they breached their fiduciary duty.

Defendants' argument against personal liability on the fiduciary theory does not

---

**8.** This construction is also consistent with the apparent intent behind the inclusion of this clause in the NBCWAs. Prior to *Lewis v. Jackson & Squire, Inc.*, 86 F.Supp. 354 (W.D.Ark. 1949), *appeal in part dismissed by*, 181 F.2d 1011 (8th Cir.1950), the clause at issue provided only that title to all monies *"paid into* the Trusts" was vested in the Trustees. *Id.* at 358. As a result, the court in *Jackson & Squire* held that due and owing monies were not vested in the Trustees and thus not part of the Trust *res. Id.* at 358–59. The 1947 NBCWA was amended to add the "due and owing" language present in the 1981, 1984, and 1988 NBCWAs. The obvious intent of this change was to avoid the result in *Jackson & Squire,* as the Supreme Court recognized in *Lewis v. Benedict Coal Corp.,* 361 U.S. 459, 466 n. 5, 80 S.Ct. 489, 493 n. 5, 4 L.Ed.2d 442 (1960).

even mention the relevant language of the NBCWAs. Rather, they rely on cases which are noncontrolling and largely inapposite to the facts at hand.

■ While not addressed by the parties in their lengthy memoranda, the Court must also dispose of another matter before reaching the conclusion that the individual Defendants personally are liable for their fiduciary breaches. The Court has become aware of a divergent line of cases dealing with the personal liability of corporate officers for breaches of ERISA fiduciary duties.

One line of cases holds that corporate officers cannot be held personally liable unless a court concludes that conduct justifying a piercing of the corporate veil is present. *See, e.g., Rockney v. Blohorn,* 877 F.2d 637, 643 (8th Cir.1989). Another line of cases holds that once an officer's fiduciary status under § 1002(21)(A) is established, personal liability attaches. *See, e.g., Dardaganis v. Grace Capital, Inc.,* 889 F.2d 1237, 1242–43 (2d Cir.1989); *Yeseta v. Baima,* 837 F.2d 380, 384 (9th Cir. 1988); *Pension Benefit Guar. Corp. v. Solmsen,* 671 F.Supp. 938, 944–45 (E.D.N.Y.1987); *Brock v. Self,* 632 F.Supp. 1509, 1523 (W.D.La.1986). While the Court might be prepared to make a veil-piercing determination as a matter of law on the current record, it is unnecessary. The language of the statute imposing liability on ERISA fiduciaries provides:

"Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter *shall be personally liable* to make good to such plan any losses to the plan resulting from each such breach...."

29 U.S.C. § 1109(a) (emphasis added).

This language strongly supports the proposition that once an officer of a corporation is deemed to be a fiduciary, he must be held personally liable for any damages caused by his breach of trust. The liberal judicial interpretation of the term "fiduciary" and the Congressionally recognized purpose of ERISA to protect the benefits of participants and beneficiaries also warrants this conclusion. *Blatt v. Marshall and Lassman,* 812 F.2d 810, 812 (2d Cir. 1987); 29 U.S.C. § 1001(a) & (b) (Congressional Declaration of Purpose).

The position of the Court of Appeals for the Fourth Circuit on this issue is unclear,[9] and decisions such as *Blohorn* are not binding on the Court. Therefore, the Court chooses to follow those decisions on the issue of personal liability which more closely approximate the language of § 1109 and the purpose ERISA as a whole seeks to achieve.

■ The Court thus concludes that there is no genuine issue of material fact as to the personal liability of the individual Defendants on the theory of fiduciary liability.[10] They are jointly and severally liable to the Plaintiffs. Accordingly, Plaintiffs are entitled to judgment as a matter of law on this issue. The Court reiterates that its holding is a narrow one. As in *Galgay,* this Court's determination of fiduciary sta-

9. The issue has been addressed by at least one district court in this Circuit. In *Brink v. DaLesio,* 496 F.Supp. 1350, 1381 (D.Md.1980), *aff'd in part, rev'd in part,* 667 F.2d 420 (4th Cir.1981), the court addressed an officer's personal liability as a fiduciary under ERISA. The plaintiffs contended that the corporate veil should be pierced, and the court agreed. *Id.* at 1381–82. However, the court cited little authority for its conclusion, and its analysis of the issue occupied less than a column of a 35 page opinion. The decision was affirmed by the Fourth Circuit without extended discussion of the issue. *Brink v. DaLesio,* 667 F.2d 420, 429 (4th Cir.1981).

The Court chooses not to follow the *Brink* decision for several reasons. First, the decision contains only a limited analysis of the issue. Second, the case was decided over a decade ago, since which this issue has undergone further development in the circuit and district courts. Finally, finding the individual Defendants personally liable without rigid adherence to the corporate form follows from the unambiguous statutory language of § 1109 and ERISA policy in general.

10. Such a result not only is warranted by the clear language of the NBCWAs signed by the corporate Defendants but also by well-established ERISA policy. As stated above, the remedial nature of ERISA dictates that it should be construed liberally to protect participants in employee benefit plans. *Teamsters Joint Council No. 83 v. Centra Inc.,* 947 F.2d 115, 123 (4th Cir.1991). This purpose would be frustrated if the Court were not to hold the individual Defendants personally liable in the instant case.

**1248**

tus rests squarely on the unambiguous and mutually agreed upon language in the relevant NBCWAs. Affixing personal liability protects the justified expectations of the parties, supports the policies underlying ERISA, and in the Court's view, faithfully observes the statutory definition of the term "fiduciary."

The Plaintiffs briefed five theories concerning the individual Defendants' personal liability for due and owing contributions. As noted in their brief,[11] these additional theories need not be addressed given the Court's resolution on the theory of the individual Defendants' personal fiduciary liability under ERISA. Axiomatically, the Court also DENIES the individual Defendants' motion for summary judgment as to their personal liability for the due and owing contributions.

### B. Damages and Intercorporate Liability

The Court concludes that there remain genuine issues of material fact as to the damages in this case. While the parties have stipulated[12] to nearly all of the corporate Defendants' joint liability for the contributions due the Plaintiffs, genuine issues of material fact remain also as to the putative liability of corporate Defendant Dixon Hardware, Inc. Therefore, this case shall proceed to trial to resolve these and any other remaining issues.

11. The Plaintiffs stated the following:
  In this brief, the Funds will set forth many grounds for holding Robertson and Ferrell personally liable for contributions based on the litany of corporate abuses set forth in the statement of facts. This Court, however, does not have to reach these issues to hold Robertson and Ferrell personally liable for contributions [if Robertson and Ferrell are found to be fiduciaries under ERISA].
  Pls.' Mem. in Supp. at 88.

12. Plaintiffs motion originally sought to hold all of the corporate Defendants jointly liable for the due and owing contributions of the coal company Defendants. However, at a status conference held on November 17, 1992, after full briefing, the parties represented that the corporate Defendants, with the exception of Dixon Hardware, Inc., did not dispute that they were

### C. Conclusion

Accordingly, the Court partially GRANTS the Plaintiffs' motion for summary judgment with respect to the personal liability of the individual Defendants for due and owing contributions. The Defendants' motions for summary judgment are hereby DENIED.

jointly liable for the due and owing contributions. The parties were in the process of preparing a stipulation to that effect when counsel for four of the debtor Defendants realized that he could not sign the stipulation without notice to other creditors involved in pending bankruptcy proceedings. Following this event, counsel for the corporate Defendants once again represented that regardless of the lack of a stipulation, they did not contest the joint liability of the corporate defendants, save Dixon Hardware, Inc.

Some factual assertions in the briefs gave the Court pause as to whether these corporate Defendants yet contested joint liability. However, given counsels' subsequent representations, the Court concludes that a grant of summary judgment in favor of the Plaintiffs on the issue of joint corporate liability is appropriate.