**SOUTHERN ELECTRICAL HEALTH FUND, et al., Plaintiffs,**

v.

**Donna KELLEY and Joe Kelley, each d/b/a K.T.E. Electric, Defendants,**

v.

**John W. Cates Construction Co., Inc., Third Party Defendant/Cross–Claim Plaintiff.**

No. 3:00–0448, 3:02–0152, 3:02–0129, 3:01–0216.

United States District Court, M.D. Tennessee, Nashville Division.

Sept. 30, 2003.

Robert Jan Jennings, Branstetter, Kilgore, Stranch & Jennings, Nashville, TN, Patrick J. O'Hara, Cavanagh & O'Hara, Springfield, IL, for Southern Electrical Health Fund, Carolinas Electrical Workers Retirement Fund, National Electrical Benefit Fund, Carolinas Electrical Workers Joint Apprenticeship & Training Fund, Atlantic Coast Chapter—NECA, Local 553 International Brotherhood of Electrical Workers, National Labor Management Cooperation Committee, Coalition for Political Education, Board 63 Collection Account Trust, pltfs.

## MEMORANDUM

ECHOLS, District Judge.

These four consolidated actions involving Plaintiffs' claims under the Miller Act and the Employee Retirement Income Security Act of 1974 ("ERISA"), as well as breach of contract cross-claims between Defendants and Third–Party Defendants, came before the Court for a bench trial from June 3 to June 6, 2003. This Memorandum Opinion constitutes the Court's findings of fact and conclusions of law as required by Fed.R.Civ.P.52(a).

### I. JURISDICTION

The Court has jurisdiction over Plaintiffs' claims under 28 U.S.C. §§ 1331 (federal question jurisdiction) and 1332 (diversity jurisdiction); 29 U.S.C. §§ 185 (suits by and against labor organizations) and 1132 (ERISA civil enforcement); and 40 U.S.C. § 3131 (Miller Act).[1]

However, the Court is without jurisdiction over the Kelleys d/b/a KTE's and Cates, Inc.'s cross-claims. As KTE has pointed out in its post-trial proposed findings and conclusions, the subcontracts between Cates, Inc. and KTE contain a mandatory arbitration clause. According to KTE, under the Federal Arbitration Act ("FAA"), the existence of the arbitration clause deprives the Court of jurisdiction to hear the cross claims, and the Court must either dismiss the cross claims or stay them pending arbitration.[2] Neither KTE

---

**1.** Prior to codification by Public Law 107–217, on August 21, 2002, this section was found at 40 U.S.C. § 270(a). The Court and the parties cited that section in previous briefs and memoranda. For purposes of clarity, the Court notes that Congress explicitly stated that the change in codification did not work any substantive changes in the Miller Act. (See

H.R. (Jud.Cmte.) 107–479, May 20, 2002 [to accompany H.R.2068] ).

**2.** KTE also asserts that Cates, Inc. raised the arbitration clause as a defense in its Answer. KTE does not point to the specific paragraph of the Answer in which it finds this defense, however, and the Court is unable to locate any mention of the arbitration clause by

nor Cates, Inc. raised this issue before trial, and Cates, Inc. still has not addressed it.

■ The FAA "provides that written agreements to arbitrate controversies arising out of an existing contract 'shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.'" *Dean Witter Reynolds, Inc. v. Byrd,* 470 U.S. 213, 218, 105 S.Ct. 1238, 84 L.Ed.2d 158 (1985) (citing 9 U.S.C. § 2). "By its terms, the Act leaves no place for the exercise of discretion by a district court, but instead mandates that district courts shall direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Id.* (citing 9 U.S.C. §§ 3, 4). Thus, "agreements to arbitrate must be enforced, absent a ground for revocation of the contractual agreement." *Id.; see Liskey v. Oppenheimer & Co.,* 717 F.2d 314 (6th Cir.1983) (holding that the FAA divests courts of any discretion regarding arbitration in cases containing both arbitrable and non-arbitrable claims, and instead requires that the courts compel arbitration of arbitrable claims, when asked to do so); *see also Dickinson v. Heinold Securities, Inc.,* 661 F.2d 638, 646 (7th Cir.1981) (holding in accord, and concluding that the Act, both through its plain meaning and the strong federal policy it reflects, requires courts to enforce the bargain of the parties to arbitrate, and "not substitute [its] own views of economy and efficiency" for those of Congress).

■ "[P]assage of the Act was motivated, first and foremost, by a congressional desire to enforce agreements into which parties had entered." *Byrd,* 470 U.S. at 220, 105 S.Ct. 1238. As a result, "[t]he

mere presence in a suit of non-arbitrating parties or non-arbitrable claims … will not defeat enforcement under the Act … regarding those claims which are arbitrable." *Tennessee Imports, Inc. v. Filippi,* 745 F.Supp. 1314, 1330 (M.D.Tenn.1990) (citing *Byrd,* 470 U.S. at 221, 105 S.Ct. 1238); *see Byrd,* 470 U.S. at 216–17, 105 S.Ct. 1238 (framing the issues as "whether to compel arbitration of pendent state-law claims when the federal court will in any event assert jurisdiction over a federal-law claim," and holding that "the Arbitration Act requires district courts to compel arbitration of pendent arbitrable claims when one of the parties files a motion to compel, even where the result would be the possibly inefficient maintenance of separate proceedings in different forums").

■ Guided by this precedent, and by Cates, Inc.'s failure to object to arbitration,[3] the Court finds that it is without jurisdiction to decide the cross-claims for breach of contract between KTE and Cates, Inc. Those cross-claims which arise out of the contracts between the two construction companies, and their dismissal from this case will not affect the Court's ability to decide Plaintiffs' claims against Third–Party Defendants Cates, Inc. and Heritage. *Cf. Filippi,* 745 F.Supp. at 1330–31 (staying non-arbitrable claims against the defendant pending arbitration, because the non-arbitral claims were "closely related to, and in part dependent upon," the arbitrable claims). Moreover, it is those claims which dominated the trial of this action, as well as pre-trial motions.

Therefore, because the Court is without jurisdiction over KTE's and Cates, Inc.'s cross-claims, the cross-claims will be dismissed. *See id.* at 1330 (stating that "dis-

Cates, Inc. in the Answer or any other place in the record. However, this does not affect the Court's analysis of the effect of the FAA on its jurisdiction over the cross-claims.

3. Moreover, Cates, Inc. drafted the contract containing the arbitration clause.

missal is often an appropriate method of referring the parties to arbitration" and choosing to dismiss arbitrable claims instead of staying them pending arbitration).

## II. PROCEDURAL HISTORY

The Court extensively related the convoluted procedural history of these consolidated actions in its Memorandum Opinion denying cross motions for summary judgment. (*See* Docket Entry No. 150[4]). All of the claims arise from construction projects at Fort Campbell Army Base ("Ft. Campbell") and Pope Air Force Base ("Pope AFB"), located in North Carolina. At both sites, KTE performed work as an electrical subcontractor for Cates, Inc., which was the prime contractor for both projects. The actions, which were consolidated on April 18, 2002 (Docket Entry No. 49), essentially seek from Cates, Inc., Mr. Cates, and Heritage, pursuant to the Miller Act, payment of contributions owed by Cates, Inc.'s subcontractor, KTE, to health or pension funds regulated by ERISA, along with membership dues or other payments required under collective bargaining agreements to which KTE was a party. Plaintiffs also seek reimbursement from Mr. Cates as an alleged fiduciary under ERISA.

The lead case in this consolidated action, No. 3:00–0448, was filed on May 9, 2000, by the Southern Electrical Health Fund, Carolina Electrical Workers Retirement Fund, National Electrical Benefit Fund, Carolinas Electrical Workers Joint Apprenticeship & Training Fund, Atlantic Coast Chapter—NECA, International Brotherhood of Electrical Workers ("IBEW") Local 553, National Labor Management Cooperation Committee, Coalition for Political Education, and Board 63 Collection Account Trust ("Board 63"). The

action was filed against Donna and Joe Kelley, d/b/a KTE, and seeks relief under ERISA, 29 U.S.C. § 1001 *et seq.*, alleging failure to submit payroll reports and pay contributions or remit membership dues or other payments, all of which were part of their employees' wages but were not paid to Plaintiff Funds. The Kelleys and KTE filed a third-party complaint against Cates, Inc., which in turn filed a counterclaim against the Kelleys and KTE. (Docket Entry Nos. 19 and 25). Thereafter, Plaintiffs added KTE as a defendant. (Docket Entry No. 40).

In No. 3:00–0448, Plaintiffs obtained a temporary injunction on August 25, 2000, requiring the Kelleys and KTE to submit payroll reports and contributions to the health and pension funds, membership dues, and other payments required by the collective bargaining agreement. (Docket Entry No. 12). Plaintiffs then filed a motion to show cause why the Kelleys d/b/a KTE should not be held in contempt for failure to comply. The motion was granted by Order entered March 23, 2001. (Docket Entry No. 15). Mr. Cates, the chief executive of Cates, Inc., was also ordered to appear and show cause why he should not be held in contempt. (Docket Entry No. 22). The show-cause hearing to determine whether Mr. Cates violated the injunction was continued several times, (Docket Entry Nos. 24, 27, 30), and eventually was scheduled to be conducted at the same time as the trial of these actions. (Docket Entry No. 49). At the hearing on November 5, 2001, a representation was made that Mr. Cates, acting through Cates, Inc., had already paid Plaintiffs in No. 3:00–0448. (*See* Docket Entry No. 34, at 12). Eventually Plaintiffs' claims against the Kelleys and KTE, including

---

**4.** Unless otherwise noted expressly or by context, docket entry numbers refer to the docket

in Case No. 3:01–0448.

those involving contempt, were settled, and judgment was entered by consent against KTE and in favor of Plaintiffs in the total amount of $230,207.58. (Docket Entry No. 110). The only remaining issue in No. 3:00–0448 is whether Mr. Cates and/or Cates, Inc. should be held in contempt for violation of the injunction.

No. 3:01–0216 was filed on March 6, 2001, by the Southern Electrical Retirement Fund and the National Electrical Contractors Association—IBEW Health and Welfare Fund, against the Kelleys d/b/a KTE, Cates, Inc., and Heritage, pursuant to the Miller Act, 40 U.S.C. § 3131 *et seq.*, in connection with construction projects at Ft. Campbell. The action was consolidated with No. 3:00–0448 on April 11, 2002, with No. 3:00–0448 being designated the lead case. (No. 3:01–0216 Docket Entry No. 24) The settlement with Plaintiffs resolved claims against the Kelleys and KTE in No. 3:01–0216. (Docket Entry No. 110). The Court extensively discussed the remaining issue of notice under the Miller Act in its Memorandum denying summary judgment and reserved for trial the question whether Cates, Inc. received sufficient notice of the amount of unpaid contributions claimed by Plaintiffs to subject it and its surety, Heritage, to liability under the Miller Act. (*See* Docket Entry No. 110).

No. 3:02–0129 was filed on March 27, 2001, in the Eastern District of North Carolina and transferred to this Court on February 7, 2002. (No. 3:02–0129, Docket Entry No. 16). Plaintiffs in No. 3:02–0129 are the same as in the lead case, No. 3:00–0448, except that several individual workers initially sought unpaid wages but dismissed their claims after they were paid. (Docket Entry No. 50). As in No. 3:01–0216, the action is against the Kelleys d/b/a KTE, Cates, Inc., and Heritage pursuant to the Miller Act, 40 U.S.C. § 3131 *et seq.* As with No. 3:01–0216, the settlement with

Plaintiffs resolved claims against the Kelleys and KTE, and the Court extensively discussed the remaining issue of notice under the Miller Act in its Memorandum denying summary judgment and reserved for trial the question whether Cates, Inc. received notice. (*See* Docket Entry No. 110). The only difference between the two actions is that No. 3:02–0129 concerns construction projects at Pope AFB.

No. 3:02–0152 was filed on February 14, 2002, by the Southern Electrical Health Fund and Carolinas Electrical Workers Retirement Fund against Mr. Cates individually, alleging that he violated the injunction entered in No. 3:01–0448 as well as his obligations as a fiduciary under ERISA. That action was consolidated with the other three cases on April 11, 2002. (No. 3:02–0152, Docket Entry No. 8). All issues in No. 3:02–0152 were to be resolved by the trial.

### III.  THEORIES AND ISSUES

#### A.  Plaintiffs' Theories

Plaintiffs made the following claims for trial:

In No. 3:00–0448, Plaintiffs assert claims against Cates, Inc. for unpaid fringe benefit contributions and other payments required to be made under collective bargaining agreements and ERISA. Plaintiffs allege that Cates, Inc. and Mr. Cates individually are responsible under the injunction and Fed.R.Civ.P. 65(d) to make contributions and other payments for the work of electricians on KTE/Cates projects at Pope AFB from March 2000 through August 2000. According to Plaintiffs, this responsibility exists due to the reach of Fed.R.Civ.P. 65(d) and the interrelation of operations, common management, centralized control and common ownership between Cates, Inc. and KTE, both of which Plaintiffs and the Kelleys

d/b/a/ KTE assert were under the control of Mr. Cates. Plaintiffs seek contempt sanctions in the amount of $145,258.68, which includes unpaid contributions due from KTE for work at Pope AFB and ERISA penalties due to non-compliance with the Court's Order entered August 28, 2000, granting Plaintiffs a temporary injunction. (*See* Docket Entry No. 12).

In No. 3:01–0216, Plaintiffs assert Miller Act claims against Cates, Inc. and its bonding company Heritage for KTE's unpaid contributions, other payments and related ERISA interest, and penalties owing due to the work of electricians at Ft. Campbell during the months of July 2000 through October 2000. Plaintiffs allege that Cates, Inc. and KTE acted together as an employer during this period; and that Cates, Inc. with KTE, had actual and timely knowledge of Plaintiffs' claims such that the nature, amount, and state of indebtedness was brought home to Cates, Inc. Plaintiffs also contend that Heritage is jointly and severally liable for the Cates, Inc. obligation. The amounts sought by Plaintiffs in No. 3:01–0216 are identical to those sought in No. 3:00–0448.

In No. 3:02–0129, Plaintiffs assert the same Miller Act claims against Cates, Inc. and its bonding company Heritage, and under the same theories of liability, as in No. 3:01–0216, but for work done at Pope AFB during the months of March 2000 through August 2000. In this action, Plaintiffs seek a total of $42,911.20, including ERISA penalties.

In No. 3:02–0152, Plaintiffs assert a claim against Mr. Cates for his actions as president and chief executive officer of Cates, Inc., as alleged president of KTE, and as a person who allegedly controlled financial affairs of both Cates, Inc. and

KTE after May 2000. Plaintiffs contend that Mr. Cates was an ERISA fiduciary personally liable under 29 U.S.C. §§ 1103, 1104, and 1109 for using corporation funds to pay other creditors instead of submitting contributions and payments to Plaintiffs as required by the collective bargaining agreement, ERISA, and the temporary injunction issued by the Court. Plaintiffs seek $111,191.41, including ERISA penalties, from Mr. Cates.

### B. Third–Party Defendants Cates, Inc., John Cates, and Heritage's Theories

According to Third–Party Defendants, Plaintiffs were not paid because Mr. Cates and Cates, Inc. did not know the full extent of KTE's indebtedness to Plaintiffs, and because Mr. Cates relied on Mr. Kelley to pay benefits to Plaintiffs. In particular, Mr. Cates and Cates, Inc. claim that they relied on false payroll statements certified by KTE that showed that they paid benefit contributions on behalf of their workers at Pope AFB and Ft. Campbell. Third–Party Defendants also deny that Cates, Inc. or Mr. Cates assumed control over KTE or are liable (with Heritage) for KTE's obligations under the Miller Act or ERISA. Rather, they allege that Mr. Cates merely signed checks, that Cates, Inc. helped KTE with its payroll and other invoices to enable it to remain on the job, and that neither knew of the nature or amounts of KTE's obligations to Plaintiffs as required by the Miller Act.

### IV. FINDINGS OF FACT

### A. The Parties

Plaintiff Funds [5] are employee welfare benefit plans or employee pension plans as those terms are defined in ERISA at

---

5. The Southern Electrical Health Fund, Carolinas Electrical Workers Retirement Fund, National Electrical Benefit Fund and Carolinas Electrical Workers Joint Apprentice-

ship & Training Fund, NECA—IBEW Health Fund, and Southern Electrical Retirement Fund.

29 U.S.C. §§ 1002(1) and 1002(2)(a). They are primarily funded by contributions remitted from multiple participating employers pursuant to negotiated collective bargaining agreements. All principal and income from such contributions and investments thereof is held and used for the exclusive purpose of providing health and welfare or pension or apprenticeship and other training benefits to participants and beneficiaries of the Funds after paying administrative and other reasonable expenses of the Funds. Each Fund has adopted a formal collection policy outlining the responsibility of employers to submit monthly payroll reports and payments, with the policy also outlining a requirement for employers to pay penalties and interest when contributions are not timely submitted.

Plaintiff Board 63 Collection Account Trust ("Board 63") and the Board 54 Collection Account Trust ("Board 54"), which is not a party to these actions, are organizations designated to receive benefit contributions payable to the Plaintiff Funds. Board 63 also receives payments from employers to Plaintiffs Atlantic Coast Chapter—NECA, the National Labor Management Cooperation Committee and the Coalition for Political Education, all of which are organizations associated with the electrical contracting industry, and working dues payable to IBEW Local 553. Contributing employers such as KTE send monthly reports and a single lump sum payment to Boards 63 and 54 which, in turn, disburse contributions to various organizations, including Plaintiffs.

KTE was incorporated in Tennessee in 1998. Although the Kelleys' testimony on this subject was confusing and contradictory, it was established at trial that Donna Kelley is the president of KTE and that Joe Kelley is its vice president. Under his collective bargaining agreement, Mr. Kelley cannot own KTE as long as he works with his tools as an electrician. However, Mrs. Kelley testified that her husband previously had been an owner of KTE.

At all times relevant to these consolidated actions, KTE was a party to collective bargaining agreements with IBEW Locals 553 and 429, which are labor organizations as defined at 29 U.S.C. § 142(3). Pursuant to these agreements, KTE was obligated to pay contributions and other sums to Plaintiffs by sending monthly reports and lump sum payments to Boards 63 and 54 within ten to fifteen calendar days after the end of each calendar month in which the work was performed. The monthly reports set out the names and hours of employees who provided services during the month and calculated the amounts withheld from wages as contributions or payments to the Plaintiffs. The reports were accompanied by a single check for the total amount, which was then disbursed to Plaintiffs. These contributions and payments were part of the wages of electricians who performed services for KTE. Contributions that are withheld from the wages of employees become assets of the Funds and are held in trust by an employer such as KTE prior to payment to the Board Trusts and ultimate disbursement to Plaintiffs.

Cates, Inc. is a Kentucky corporation. Mr. Cates is the principal shareholder and president of Cates, Inc. Cates, Inc. contracted to perform work as the general contractor on two government construction projects at Ft. Campbell, the Soldiers' Chapel and Wilson Theater, and one at Pope AFB, a dormitory complex. Cates, Inc. obtained payment and performance bonds from Heritage for the construction projects at Pope AFB and Ft. Campbell.

### B. The Contract Between Cates, Inc. and KTE

On February 22, 1999, Cates, Inc. entered into a subcontract with KTE, under

which KTE was to provide electrical construction services to Cates, Inc. at the Pope AFB dormitory project. David Tyndall, an employee of Cates, Inc., asked Mr. Kelley of KTE to help via the subcontract because Cates, Inc. had underbid electrical work on the fixed price project by approximately $250,000.

However, Mr. Kelley was concerned that the work at Pope AFB might be beyond the financial ability of KTE and too far away from his home office in Tennessee. He and Mr. Tyndall agreed to the subcontract based on special provisions for payments to Plaintiffs by Cates, Inc. under terms of a change order to the contract. The change order was approved and signed by Mr. Cates and executed contemporaneously with the subcontract. The change order stated in pertinent part:

> Cates Construction to be responsible for handling all monies, paying all invoices incurred under the sub-contract including payroll for KTE. Payroll to be payed [sic] weekly. Cates to dig all ditches, trenches and backfill for KTE, and also all concrete pads for transformers. Delete liquidated damages from sub-contract and retainage of any kind. Joe Kelley of KTE when traveling to job site to stay in Cates' house at no charge. KTE is responsible for submittals and submit [sic] them in a timely fashion.

While designated "change order," this provision in fact was an integral part of the contract to the parties, both because it was executed contemporaneously therewith, and because KTE required it to serve as subcontractor. Mr. Cates himself described the change order as "housekeeping to the contract." Although Mr. Cates has alleged that the parties' intent was merely for Cates, Inc. "to help [KTE] with the money ... to cover his payrolls and ... his bills," and not to assume any financial obligations on behalf of KTE, the clear language of the change order obligates Cates, Inc. to pay and be responsible for all invoices, including payroll, incurred by KTE on the Pope AFB dormitory project.

## C. Work on the Pope AFB Dormitory Project

KTE began work at Pope AFB for Cates, Inc. sometime in February or March 1999. From the project's inception, KTE worked out of Cates, Inc.'s office space at Pope AFB and used its copy and fax machines. Cates, Inc. personnel on site included a superintendent, project manager, secretary, and quality control inspectors. Also from the beginning of the project, the first supervisor on the job for KTE provided payroll reports to Cates, Inc.'s on-site secretary. While Cates, Inc. later provided KTE with a separate trailer to use as office space, KTE's supervisor continued the practice of providing payroll reports to Cates, Inc. According to the KTE supervisor who was on-site during the project's early phases, the relationship between Cates, Inc. and KTE was not a normal general contractor-subcontractor one, because Cates, Inc. was much more involved in KTE's day-to-day operations and provided more support (both in terms of finance and materials) than a general contractor normally would. KTE's crew size averaged 15 men during the Pope AFB project. Joe Kelley made only four or five visits to the site.

Pursuant to the change order, KTE submitted invoices to Cates, Inc. on a monthly basis for the lump sum amounts due to Plaintiffs. Cates, Inc. would then pay the invoiced sum to KTE which, in turn, paid the lump sum to Plaintiffs by submitting a payroll report and lump sum payment to Board 63. In the spring and summer of 2000, KTE's supervisor and electricians became aware that a number of benefits checks from KTE to Board 63 had bounced, and that as a result their benefits were not being paid.

KTE timely submitted invoices and information to Cates, Inc. about the contributions and payments that were due for work at Pope AFB through February 2000, and until December 1999 Cates, Inc. paid KTE the amounts due and KTE, in turn, paid the sums due Plaintiffs to Board 63. Contributions for December 1999 and January and February 2000 were not received timely by the Board 63 Trust or Plaintiffs. The Plaintiffs did not receive payments for December 1999 through February 2000 attributable to Pope AFB until about July 2000. KTE has never paid Plaintiffs for work performed at Pope AFB from March through August 2000.

During the months of March through July 1999, the electricians' union hall told KTE's supervisor that its workers' benefits were not being paid. As a result, KTE's supervisor was unable to persuade more union electricians to work on the project. On behalf of Cates, Inc., John Paul Cates hired non-union electricians to work on the Pope AFB dormitories. Cates, Inc. also appointed its own supervisor over the non-union workers and assigned them to two dormitories, leaving KTE and its union employees to finish work on the remaining dormitory at Pope AFB.

In May 2000, KTE's supervisor at the Pope AFB dormitory project was told by John Paul Cates, Jr., Mr. Cates' son, that Cates, Inc. had bought KTE. The supervisor assumed this statement was true, based on the fact that Joe Kelley confirmed it, that KTE began using Cates, Inc.'s phone for all project-related calls, and that Mr. Cates' or John Paul Cates' signature appeared on the KTE workers' paychecks.

KTE left the Pope AFB project on August 13, 2000, after being asked to leave by Cates, Inc.'s supervisor. KTE had completed only 50 to 60 percent of the project, even though it had been paid roughly $880,000 by Cates, Inc. KTE's supervisor turned over all of KTE's tools to Cates, Inc., in the belief that Cates, Inc. had owned them since May 2000.

When KTE left Pope AFB in August 2000, it owed Plaintiffs a principal amount of $70,649.71 in connection with KTE's work there. As of the date of trial, Plaintiffs were also entitled to ERISA penalties and interest, raising the total amount due Plaintiffs to $145,258.68.

### D. Work on the Ft. Campbell Projects

On or about October 4, 1999, Cates, Inc. entered additional subcontracts with KTE to provide electrical services at Ft. Campbell as a subcontractor on two construction projects on which Cates, Inc. was the general contractor: the Soldier's Chapel and Wilson Theater. KTE began work on the Ft. Campbell projects in December 1999 or January 2000. KTE and Cates, Inc. followed the same scheme of KTE submitting to Cates, Inc. invoices containing payroll information about amounts owed to Plaintiffs. Cates, Inc. honored the invoices by payment to KTE, which then sent the required payroll reports and payments to Board 54 for disbursement to Plaintiffs.

KTE provided services to Cates, Inc. at Ft. Campbell until on or about September 23, 2000. When KTE quit working on the Soldier's Chapel and Wilson's Theater projects at Ft. Campbell in October 2000, Plaintiffs were owed a principal amount of $27,399.86 in connection with KTE's work. As of the date of trial, Plaintiffs were also entitled to ERISA penalties and interest, thereby raising the total amount due Plaintiffs to $42,911.20.

### E. Benefits Owed to Plaintiffs

KTE and Mr. Kelley provided Cates, Inc. precise information about the benefit contributions due Plaintiffs for March

through August 2000 on the Pope AFB projects, and Cates, Inc. recorded each monthly obligation as an account payable. The recording as an account payable occurred after an invoice from KTE or another organization was received by Cates, Inc., and a Cates, Inc. employee entered the invoice cost on the computer system. This procedure was followed on invoices for equipment as well as for labor costs.

Mr. Cates acknowledged that Cates, Inc. received the KTE invoice for amounts due Plaintiffs for working the month of April 2000 and also the invoice for May 2000. A Cates, Inc. employee was authorized by Mr. Cates to pay these invoices. The payments due to Plaintiffs for the months of April 2000 and May 2000 were recorded by Cates, Inc. as an account payable to KTE. Cates, Inc. did not make a payment to KTE for those months until July 14, 2000, when it deposited $45,000 into KTE's bank account. On the same day, Cates, Inc. disbursed a check for $20,000 from KTE's account to U.S. Rental and Supply Co. ("US Rental"), a company wholly owned by Cates, Inc. Cates, Inc. paid U.S. Rental another $4,000 from the KTE account on July 18, 2000. No checks were ever written from the KTE account to Board 63 to cover the unpaid April and May benefits.

It was not until June and July 2000 that Cates, Inc. next paid KTE, which in turn paid Board 63 and Plaintiffs. These payments were for the work of KTE electricians at Pope AFB in December 1999 and January and February 2000. In the interim, between receipt by Cates, Inc. from KTE of invoices for April and May 2000 and the payments in June and July of the invoices for December through February, the financial and business relationship between Cates, Inc. and KTE changed.

In early April 2000, Mr. Kelley and Mr. Cates discussed the problems caused because many of KTE's invoices to Cates, Inc. for work at Pope AFB, including invoices for payments to Plaintiffs, were not paid or payment was delayed for sixty to ninety days. On May 3, 2000, Mr. Kelley and Mr. Cates had additional discussions regarding the financial situation of KTE and a possible sale of KTE to Mr. Cates and others. By that time, Mr. Cates had received KTE's invoices for payments due to Plaintiffs for December 1999 through April 2000. After the meeting, KTE closed its checking account and its home office in Tennessee, all at Mr. Cates' direction. Following the May 3, 2000, meeting, KTE operated solely from the offices of Cates, Inc. in Russellville, Kentucky, and Mr. Cates took over financial administration of KTE. This was in addition to the change order which had required Cates, Inc. "to be responsible for handling all monies."

After May 3, 2000, Cates, Inc. opened a new checking account for KTE with Citizens National Bank in Kentucky. Mr. Cates had a long banking relationship with Citizens National Bank. In connection with the new checking account, Mr. Cates represented himself as the president of KTE. Mr. Cates initially had sole signatory authority with respect to the account. The checks for the new KTE checking account were maintained by a Cates, Inc. employee and accessible only to Mr. Cates or Cates, Inc. employees. Mr. Kelley was added as a signatory to the account sometime in August when Mr. Cates was out of town and unable to sign checks. After KTE moved into Cates, Inc.'s Kentucky office, Mr. Cates opened KTE mail delivered to Cates, Inc.'s office. Mr. Kelley on one occasion opened mail addressed to KTE at the Cates, Inc. address and was told by a Cates, Inc. employee that only Mr. Cates was authorized to open mail.

Mr. Cates apparently was not the only Cates, Inc. employee who believed he had assumed a position on the KTE board of

directors. By letters dated October 6, 2000, Mr. Cates, his son, and other Cates, Inc. employees purported to resign from the KTE board.

After the May meeting, KTE continued to submit invoices to Cates, Inc. for payroll and other expenses incurred by KTE in connection with work at Pope AFB and Ft. Campbell. These invoices were reviewed by an employee of Cates, Inc., who confirmed to Mr. Cates that the invoices could be paid. These invoices were also recorded as an account payable to KTE by Cates, Inc. through entries made on the Cates, Inc. computer system. When Cates, Inc. deposited sums in the KTE checking account, checks written on KTE's checking account were submitted to Mr. Cates for his signature at his direction. While the sale of KTE to Cates, Inc. never was consummated, and Cates, Inc. never acquired formal ownership of KTE, Mr. Cates and Cates, Inc. assumed control over all financial affairs of KTE after May 3, 2000.

Sometime in May 2000, after Plaintiffs filed No. 3:00–0448 and mailed a copy of the summons and complaint to KTE at Cates, Inc.'s office, Mr. Cates saw a copy of the summons and complaint alleging that KTE had failed to pay benefits contributions to Plaintiffs based on its employees' wages. Mr. Cates asked Mr. Kelley what the civil action was about. A copy of the summons for No. 3:00–0448 that was reviewed by Mr. Cates included notations of sums that corresponded exactly with the principle amounts due to the Plaintiffs from KTE for the months of December 1999 and January through April 2000. The entries for December 1999, and January and February 2000 are marked through, reflecting that the marking must have occurred in June or July when those payments were made. The remaining entries for March and April are not marked out and have not been paid to the Plaintiffs

as of the time of trial. Mr. Cates identified the handwriting on the summons as that of an employee of Cates, Inc. who was authorized by Mr. Cates to review the summons on Cates, Inc.'s behalf. Mr. Cates initialed the summons to show that he had seen it.

Therefore, by May and June 2000, Mr. Cates and Cates, Inc. had actual knowledge KTE was obligated under the collective bargaining agreement to report and pay to Plaintiffs via Board 54 and 63, and that KTE had defaulted on those obligations. After the May 3, 2000 meeting, Mr. Cates exercised discretionary authority and control regarding the management of all KTE finances and personally made decisions about whether or not to pay Plaintiffs according to KTE invoices and the monthly reports of KTE. By the time that KTE paid Plaintiffs in June and July 2000 the contributions due as a result of the work of electricians in December 1999 and January and February 2000, Mr. Cates and Cates, Inc. knew the precise amounts due Plaintiffs.

Mr. Cates' knowledge of KTE's unpaid obligations is further evidenced by a letter dated May 19, 2000 pertaining to KTE's work at Ft. Campbell. The Board 54 Trust wrote KTE a letter addressed to the Kentucky office of Cates, Inc. This letter advised KTE that a check for $16,380.38 for work performed in March 2000 had been returned for insufficient funds. Mr. Cates had actual knowledge of this letter, as reflected by his testimony and also his initials on the letter.

In June and July 2000, Mr. Cates signed KTE checks for contributions to the Plaintiffs for work performed at Pope AFB during the months December 1999 ($9,460.75) and January and February 2000 ($20,640.59). Mr. Cates knew that these checks had something to do with the benefits under the KTE collective bargain-

ing agreements with a union. These checks were received and credited by Plaintiffs and sums in the amount of the checks which were noted on the summons were marked through.

Mr. Cates denied approving invoices for these payments, but it is undisputed that, at his direction, an employee of Cates, Inc. determined the payments could be made and Mr. Cates then signed the checks based on the determination. The checks were received by Plaintiffs, and Mr. Cates' execution of these checks establishes his knowledge that KTE was obligated to make payments to the Plaintiffs and that KTE was delinquent in those payments.

When on July 7, 2000, the Plaintiffs filed a motion for a temporary injunction in No. 3:00–0448 based on KTE's failure to submit reports and pay contributions, Mr. Cates received a copy of the supporting memorandum. The memorandum specifically stated that KTE was required to make reports and payments to the Plaintiffs and had failed to do so. Mr. Cates also initialed the copy of the memorandum and wrote on it "check with me Joe," referring to Mr. Kelley. At one time, when Mr. Cates spoke with Mr. Kelley about the injunction, he suggested KTE could avoid the injunction by filing for bankruptcy. Mr. Cates' review of the memorandum and this conversation show his knowledge that KTE was obligated to make payments to the Plaintiffs, that KTE was delinquent in those payments, and that Plaintiffs were seeking an injunction to require the payments.

Although aware of KTE's obligations to Plaintiffs, Mr. Cates diverted funds which should have been paid to them. Mr. Cates caused Cates, Inc. to deposit funds in KTE's checking account attributable to contributions withheld from employees' wages; yet despite his control over KTE's checking account, he failed to write or sign any check forwarding payments to Plain-

tiffs for amounts due between March and August 2000. Mr. Cates instead diverted the funds in the KTE checking account to other creditors, including his wholly-owned subsidiary, U.S. Rental. This is demonstrated by Cates' action on July 14, 2000, after he received Plaintiffs' memorandum in support of their motion for a temporary injunction and was aware of the delinquency of KTE's payments to Plaintiffs. On that date he signed a Cates, Inc. check payable to KTE for $45,000. According to a handwritten notation on the check stub, the $45,000 was attributable to employee benefits payable to Plaintiffs for March 2000 and part of April 2000. The amounts set out in the handwritten notation correspond with the invoices that KTE issued to Cates, Inc. for these payments.

Although Mr. Cates had authority to issue and sign KTE checks and was the only person who signed KTE checks after May 2000, no KTE check was ever written or sent to the Board 63 Trust for disbursement to the Plaintiffs for the amounts reflected in the invoices for March and April 2000 employee benefits. Mr. Cates did, however, immediately with the deposit of $45,000 on July 14, 2000, sign two KTE checks for a total of $34,000 payable to U.S. Rental, a wholly-owned subsidiary of Cates, Inc. Mr. Cates and Cates, Inc. did not generate any invoice from U.S. Rental that reflected the purpose of these checks, but the payment to the wholly-owned subsidiary is consistent with other action by Mr. Cates, as when the KTE checking account was eventually closed by Cates, Inc. on October 11, 2000 and the balance transferred to USA Rental.

On July 19, 2000, counsel for Plaintiffs wrote KTE at the Kentucky address of Cates, Inc. regarding non-receipt of payments for January and February 2000. Mr. Cates saw this letter as evidenced by his initials and a notation on the letter to

"check with me." That letter specifically referred to KTE's obligations to submit payments to Plaintiffs. At the time, Mr. Cates controlled the checking account of KTE and an employee of Cates, Inc. maintained KTE's accounts payable ledger which had a "book date" of 5/1/00, 5/30/00, and 7/12/00 for amounts due Plaintiffs. Mr. Cates had actual knowledge of these payments that were due to Plaintiffs.

By letter dated July 31, 2000, the NECA–IBEW Welfare Trust Fund advised KTE that it had not received KTE's report for the month of April 2000. This was for work of KTE electricians at Ft. Campbell. Mr. Cates had actual knowledge of this letter, as reflected by his testimony and his initials on the letter.

On August 3, 2000, Plaintiffs' counsel wrote directly to Mr. Cates and advised him that Mr. Kelley had reported that 90% of the interest in KTE was sold to Mr. Cates. The August 3 letter stated that no contributions to Plaintiffs had been made by KTE for the months after March 2000. Mr. Cates testified that he discussed the August 3 letter with Mr. Kelley. At the time, Mr. Cates was signing all of the checks for KTE.

On August 7, 2000, Mr. Cates consulted with his attorney regarding Plaintiffs' claims. Mr. Cates' attorney then wrote counsel for Plaintiffs and represented that Mr. Cates was not aware of pending or threatened litigation against KTE. Mr. Cates' testimony and notations on copies of pleadings in No. 3:00–0448 demonstrate, as does the accounts payable register for Cates, Inc., that he was well aware of the litigation and the fact that KTE owed money to Plaintiffs. Mr. Cates also had or should have had knowledge of the exact or nearly exact amount of KTE's liability to Plaintiffs.

Mr. Cates also responded directly to the August 7 letter from Plaintiffs' counsel. He acknowledged having "take[n] charge of the [KTE] checking account" immediately after the May meeting. In his letter, Mr. Cates confirmed that he, as head of Cates, Inc. was still in charge of the KTE checking account. Mr. Cates had control over the checking account until it was closed in October and the balance transferred to U.S. Rental.

KTE did not make any payments to Plaintiffs for the work of electricians at Pope AFB after entry of the temporary injunction, and payments for March 2000 through August 2000 remain due. KTE through checks signed by Mr. Cates made payments to the Plaintiffs attributable to the work of electricians at Ft. Campbell through July 2000. KTE did not make payments to Plaintiffs attributable to the work of electricians at Ft. Campbell for the months August and September 2000.

Thus, Mr. Cates and Cates, Inc. on numerous occasions after May 2000 received clear notice that KTE withheld portions of its electricians' wages for work performed at Pope AFB and Ft. Campbell. The withheld sums were to be contributions and payments to Plaintiffs, but Mr. Cates, Cates, Inc., and KTE failed to forward those contributions and payments to the Plaintiffs. Mr. Cates also had notice of the injunction in No. 3:00–0448, he had or was reckless in not having knowledge of amount of KTE's delinquency as evidenced by the invoices from KTE to Cates, Inc. and also the accounts payable ledger maintained by Cates, Inc. at the direction of Mr. Cates, the sums of which equate to the notations on the summons he had seen and initialed.

Both before and particularly after May 2000, Cates, Inc. controlled KTE. Contrary to his version of the relationship between Cates, Inc. and KTE, Mr. Cates did more after April and May than merely sign checks. Invoices, including those for payments to Plaintiffs, were submitted to Mr.

Cates for his specific approval, and he signed the checks to pay the invoices for KTE after such approval. This process was exemplified by Mr. Cates' testimony about a check approved and signed by him on July 16, 2000, and payable to Board 63, although he testified he "wouldn't have a slightest idea what a collection account trust is." This declaration begs the question: Did Mr. Cates know the purpose of the check he approved and signed? The check stub states it was for the "December 1999 Monthly Payroll Report," and Mr. Cates' claim he did not know this until the trial commenced is not credible. Either Mr. Cates knew, or he remained willfully blind to the delinquent contributions.[6]

Mr. Cates' purported confusion and ignorance regarding the nature and extent of KTE's ongoing obligations to Plaintiffs is further belied by his acknowledgment of a letter dated July 19, 2000 that specifically refers to receipt of a check in the sum of $20,640.59 for January and February obligations to Plaintiffs. Mr. Cates wrote on the letter, "check with me," to Mr. Kelley to explain the letter to him. Plaintiffs proved at trial that among a list issued by Cates, Inc.'s software system of checks payable to KTE for invoices is an entry for July 17, 2000, to Board 63 in the amount of $20,640.59. This sum correlates exactly with a check approved and signed by Mr. Cates showing $8,401.42 and $12,239.17 paid to Plaintiffs (the respective amounts for the January and February obligations set forth in the July 19, 2000 letter). In the face of the specific correlation of these sums and Mr. Cates' direct involvement with their processing, his insistence of ignorance regarding the nature and extent of the ongoing obligations to Plaintiffs is not believable, particularly given that he

admitted executing a check in the amount of $16,388.38 to Plaintiffs to cover a KTE check returned for insufficient funds.

Mr. Cates' purported reliance on certified payroll statements to show Plaintiffs were paid is also flawed. Mr. Cates did not adequately explain how he could rely on certified payroll statements when he also received the letters of May 19, 2000, July 31, 2000, and August 3, 2000, which showed Plaintiffs had not been paid. His supposed "reliance" on the certified payroll statements is unreasonable and cannot shield him from being charged with both the knowledge and shared responsibility for ongoing payments to Plaintiffs. On the other hand, his admitted familiarity with the certified payroll statements proves he had knowledge of amounts due Plaintiffs for each week of work by electricians at Pope AFB and Ft. Campbell.

## V. CONCLUSIONS OF LAW

### A. Mr. Cates and Cates, Inc. Are In Contempt of Court

Plaintiffs ask the Court to find Mr. Cates and Cates, Inc. in contempt for violating the temporary injunction that the Court entered against the Kelleys d/b/a KTE in No. 3:00–0448, and to order Mr. Cates and Cates, Inc. to purge their contempt by paying Plaintiffs a compliance fine in the amounts required to be paid by the injunction.

■ Whether the Court's injunction applied to Mr. Cates and Cates, Inc. appears to be a mixed question of law and fact. *United States v. Hochschild*, 977 F.2d 208, 211 (6th Cir.1992) (citations omitted). The Federal Rules of Civil Procedure provide that every injunctive order is binding upon

---

6. The same conclusion applies to Mr. Cates' denial that he knew in April and May 2000 that KTE owed Plaintiffs $20,999.59. He first stated he did not know whether a specific invoice was submitted to him for this amount, but then acknowledged the invoice was submitted to him.

"the parties to the action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise." Fed.R.Civ.P. 65(d). Accordingly, "[a]s a matter of law, injunctions are binding on a party's officers if they receive actual notice of the injunction." *Hochschild,* 977 F.2d at 211 (explaining that "whenever an injunction, whatever its nature may be, is directed to a corporation, it also runs against the corporation's officers, in their corporate capacities").

■ As the Sixth Circuit has explained, "Rule 65(d) 'is derived from the common law doctrine that a decree of injunction not only binds the parties defendant but also those identified with them in interest, in privity with them, represented by them or subject to their control.'" *Blackard v. Memphis Area Medical Center for Women, Inc.,* 262 F.3d 568, 574 (6th Cir.2001) (quoting *Regal Knitwear Co. v. NLRB,* 324 U.S. 9, 14, 65 S.Ct. 478, 89 L.Ed. 661 (1945)). "To determine whether a person is one who acts in concert or is identified in interest with the enjoined party, the court must look to the actual relationship between the person enjoined and the person thought to be bound by the injunction." *Id.*

■ The Court has found that Mr. Cates controlled the financial affairs of KTE after May 2000. He had actual notice of the precise amounts due Plaintiffs for the work of electricians at Pope AFB because (1) he received and reviewed a copy of the complaint in No. 3:00–0448, which contained on the summons notations of the amounts due; (2) Cates, Inc. received invoices for the amounts due from Kelley and KTE; and (3) Mr. Cates received and initialed a copy of the memorandum pertaining to the motion for a temporary injunction and which stated the

Court was requested to enter an injunction requiring KTE to "submit reports and payments required under a collective bargaining agreement" and emphasized that Plaintiffs "cannot always pay benefits without receipt of the corresponding contributions and the resultant irreparable harm to participants (employees of [KTE]) justifies entry of an injunction."

For example, as the chief executive officer of Cates, Inc. and the person responsible for KTE finances, Mr. Cates knew or should have known that the accounts payable register of Cates, Inc. showed the following amounts as an indebtedness owed by Cates, Inc. to KTE:

| Book Date | Amount |
|---|---|
| 5/1/01 | $20,999.59 |
| 5/1/01 | 16,742.62 |
| 5/30/01 | 12,187.63 |
| 7/11/00 | 7,756.88 |
| 8/8/00 | 4,971.51 |

These are the precise amounts that were not paid to Plaintiffs according to the monthly payroll reports of KTE. These are the precise amounts the injunction required to be paid, and are the amounts noted on the summons initialed by Mr. Cates.

At the time the injunction was entered and thereafter, Mr. Cates and Cates, Inc. had assumed responsibility for all of the financial operation of KTE. Mr. Cates was in charge of Cates, Inc., and an employee of Cates, Inc. was responsible under his direction for preparing checks to pay KTE's obligations to Plaintiffs. Mr. Cates exercised exclusive signatory authority over the checking account of KTE after May 2000.

■ Mr. Cates and Cates, Inc. therefore knew the amounts that were due in No. 3:00–0048. Mr. Cates failed and refused to make payments to Plaintiffs as required by the temporary injunction, although he had notice of the injunction. Even though Mr. Cates may not actually have read the

summons or memorandum in No. 3:00–0448 before initialing them, there is no question that he controlled KTE and was "identified with [KTE] in interest, in privity with [KTE]." *Blackard,* 262 F.3d at 574. Accordingly, under Fed.R.Civ.P. 65(d) and Sixth Circuit precedent, Mr. Cates and Cates, Inc. were bound to abide by the injunction entered in No. 3:00–0448. Because they failed to do so, they are in civil contempt of court.

■ Proper compliance with the temporary injunction would have required KTE to pay Plaintiffs for the work of electricians at Pope AFB. The amount due at the time of trial was $145,258.68. Therefore, Mr. Cates and Cates, Inc. are directed to pay Plaintiffs this amount as a compliance fine to purge their contempt.

## B. Mr. Cates and Cates, Inc. Possessed Notice Under the Miller Act

■ In Nos. 3:01–0216 and 3:02–0129, Plaintiffs assert claims against Cates, Inc. and Heritage for failure to pay contributions under the Miller Act, 40 U.S.C. § 3131. The Miller Act requires prime contractors on most federal government construction projects to post a surety bond to protect all persons supplying labor and material for the project who have a direct contractual relationship with either the prime contractor or a subcontractor. *F. D. Rich Co. v. U.S. for Use of Indus. Lumber Co.,* 417 U.S. 116, 118, 94 S.Ct. 2157, 40 L.Ed.2d 703 (1974); *J.D. Fields & Co. v. Gottfried Corp.,* 272 F.3d 692, 696 (5th Cir.2001); *United States ex rel. Int'l Brotherhood of Elec. Workers, Local Union 692 v. Hartford Fire Ins. Co.,* 809 F.Supp. 523, 524 (E.D.Mich.1992). The Act does not limit recovery to wages; con-

tributions to welfare and health funds are a part of compensation under the Act. *Hartford Fire,* 809 F.Supp. at 525 (citing *United States ex rel. Sherman v. Carter,* 353 U.S. 210, 218–220, 77 S.Ct. 793, 1 L.Ed.2d 776 (1957)).

■ The Act gives a person supplying labor or material the right to sue on the payment bond for non-payment, within 90 days of the last day on which work was done or material provided by the claimant. "This provision contemplates a contractual relationship express or implied with the contractor furnishing the payment bond." *United States ex rel. Bruce Co. v. Fraser Constr. Co.,* 87 F.Supp. 1, 3 (W.D.Ark. 1949). The Act provides an exception to this expectation, however. Where a person does not have a contractual relationship with the general contractor furnishing the payment bond but has a direct contractual relationship with the subcontractor, the statute establishes three conditions to payment from the general contractor's bond: (1) notice must be given within 90 days of the subcontractor's last work; and (2) the notice must state with substantial accuracy the claimed amount; as well as (3) the name of the party for whom the labor or material was supplied. *United States ex rel. S & G Excavating, Inc. v. Seaboard Surety Co.,* 236 F.3d 883, 884 (7th Cir.2001).[7] Put another way, "a notice to the general contractor will be sufficient only if 'it plainly appears that the nature and state of the indebtedness was brought home to the general contractor.'" *Gottfried,* 272 F.3d at 696 (citing *Houston Fire & Cas. Ins. Co. v. United States ex rel. Trane Co.,* 217 F.2d 727, 730 (5th Cir.1954)). Courts have found the amount

---

**7.** This notice provision of the Miller Act operates as a strict condition precedent to recovery. *United States ex rel. John D. Ahern Co. v. J.F. White Contracting Co.,* 649 F.2d 29, 31 (1st Cir.1981); *United States ex rel. Material*

*Servs. Div. of General Dynamics Corp. v. Home Indemnity Co.,* 489 F.2d 1004, 1005 (7th Cir. 1973); *United States ex rel. Noland Co. v. Andrews,* 406 F.2d 790, 791 (4th Cir.1969).

claimed under the Miller Act to be "stated with sufficient certainty where a court can determine damages 'with reasonable certainty and accuracy, without resort to conjecture, guess or speculation.'" *U.S. ex rel. Moody v. Am. Ins. Co.*, 835 F.2d 745, 748 (10th Cir.1987) (quoting *United States ex rel. Altman v. Young Lumber Co.*, 376 F.Supp. 1290, 1299 (D.S.C.1974); *United States ex rel. John D. Ahern Co., Inc. v. J.F. White Contr. Co.*, 649 F.2d 29, 32 (1st Cir.1981) (stating that "plaintiff was not required to determine its claim to the point of mathematical certainty")).

The Court extensively discussed the Miller Act's notice requirements in the memorandum accompanying its denial of the parties' cross motions for summary judgment. (*See* Docket Entry No. 150). The Court held that Plaintiffs' failure to send notice of their claim to Mr. Cates via certified mail, or to Cates, Inc. rather than Mr. Cates, did not preclude Plaintiffs from recovering under the Miller Act, since their written notice actually was received and acknowledged by Mr. Cates—*provided, however, that the contents of the notice also met the Miller Act requirements—i.e., that Mr. Cates knew the amount claimed.*[8]

Plaintiffs sufficiently provided notice to Cates, Inc. of the amount claimed because the record establishes that both Cates, Inc. and Mr. Cates possessed independent knowledge of the amount owed to the

Plaintiffs from KTE with a great degree of specificity. Mr. Cates also had clear notice of the amount of KTE's delinquency as evidenced by the accounts payable ledger maintained by an employee of Cates, Inc. at the direction of Mr. Cates and the notations on the summons.

Further, Mr. Cates is specifically charged with notice of the amounts owed to Plaintiffs. This is because during the course of work by electricians at Ft. Campbell and Pope AFB, a series of monthly payroll reports was prepared and submitted to Plaintiffs by KTE. Those reports also state with precision the specific amounts due to Plaintiffs.

Plaintiffs shall prevail on their claims under the Miller Act against Cates, Inc. and Heritage. Judgment will be entered in favor of Plaintiffs and against Cates, Inc. and Heritage in No. 3:01–0216, attributable to work at Pope AFB in the total amount of $145,258.68,[9] and in No. 3:02–0129, attributable to work at Ft. Campbell, in the total amount of $42,911.20.

## C. Mr. Cates Is Liable As a Fiduciary Under ERISA

In No. 3:02–0152, Plaintiffs assert claims against Mr. Cates for breach of fiduciary obligations under ERISA. Plaintiffs allege that KTE and Cates, Inc. were a joint employer after May 2000, and that each is

---

8. The Court stated:

In this case, the Court believes that Plaintiffs' failure to state the amount of their claim in their notices to Cates and Heritage are not fatal to their Miller Act action, because evidence in the record indicates that Cates may also possessed independent knowledge of the amount owed to Plaintiffs from KTE Electric with some degree of specificity. This information may have been provided by the certificates of compliance/payroll verifications provided by KTE Electric to Cates, as well as by Cates's direct payroll deposits to Plaintiffs after it executed the change order with KTE Elec-

tric. The Court does not find that Cates did possess this information, merely that it may have. Because this raises a genuine issue of material fact, and because other courts have held similar invoices to be effective Miller Act notice when coupled with other written claims, the Court will deny Defendants' Motions for Summary Judgment.

9. For the sake of clarity, the Court notes that this amount is the same amount, for the same unpaid contributions for work done at Pope AFB, as Plaintiffs seek in No. 3:00–0448. Obviously, Plaintiffs cannot recover the amount ($145,258.68) twice.

deemed to be responsible for conditions of employment of the electricians who worked at Pope AFB and Ft. Campbell. Plaintiffs further allege that as the president of Cates, Inc., which was the joint employer of the electrical workers who contributed to Plaintiff Funds, Mr. Cates was a fiduciary and is personally liable under ERISA for diverting plan assets to pay other creditors.

■ To determine whether Cates, Inc. and KTE "can be considered a joint employer for purposes of liability under ERISA and a collective bargaining agreement, the [C]ourt must consider the following four factors: (1) interrelation of operations, (2) common management, (3) centralized control of labor relations, and (4) common ownership." *Michigan State Painters Ins. Fund v. Ron Simmons Painting, Inc.*, 875 F.Supp. 417, 421 (E.D.Mich.1995) (citing *Int'l Longshoremen's Ass'n v. Norfolk Southern Corp.*, 927 F.2d 900, 902 (6th Cir.), *cert. denied*, 502 U.S. 813, 112 S.Ct. 63, 116 L.Ed.2d 38 (1991); *Distillery, Wine & Allied Workers Int'l Union v. National Distillers & Chemical Corp.*, 894 F.2d 850, 852 (6th Cir.), *cert. denied*, 498 U.S. 820, 111 S.Ct. 66, 112 L.Ed.2d 40 (1990); *Metropolitan Detroit Bricklayers Dist. Council v. J.E. Hoetger & Co.*, 672 F.2d 580, 584 (6th Cir.1982)); *see also Carrier Corp. v. NLRB*, 768 F.2d 778, 781 (6th Cir.1985) (stating that "the proper legal standard to determine if a joint employer relationship exists is, 'where two or more employers exert significant control over the same employees—where from the evidence it can be shown that they share or co-determine those matters governing essential terms and conditions of employment—they con-

stitute "joint employers" within the meaning of the NLRA' ") (quoting *NLRB v. Browning–Ferris Indus. of Pennsylvania, Inc.*, 691 F.2d 1117, 1124 (3d Cir.1982)). The resolution of this question is essentially a factual issue. *Simmons Painting*, 875 F.Supp. at 421 (citing *Boire v. Greyhound Corp.*, 376 U.S. 473, 84 S.Ct. 894, 11 L.Ed.2d 849 (1964)).

■ The Court concludes that KTE and Cates, Inc. were joint employers of the electricians working at Pope AFB and Ft. Campbell from May 2000 until the workers left the projects. However, that conclusion standing alone cannot subject Mr. Cates to personal liability under ERISA.

■ Plaintiffs allege that Mr. Cates is a fiduciary of the electrical workers' benefits plan. "Under ERISA, a person is a fiduciary with respect to a plan to the extent that 'he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets....' " [10] *Best v. Cyrus*, 310 F.3d 932, 934–35 (6th Cir.2002) (quoting 29 U.S.C. § 1002(21)(A)). "The term 'fiduciary' should be defined not only by [official job] titles, such as 'trustee,' but also by the authority that a person has or exercises over a plan." *Id.* at 934 (citation omitted). Accordingly, a person may be a fiduciary without being a trustee, if he is responsible for such things as investments and distributions, or if he exercised discretion over the plan's management, assets, and administration. *Id.* at 935. Congress intended the definition of fiduciary in ERISA "to be broadly construed." *LoPresti v. Terwilliger*, 126 F.3d 34 (2d Cir.1997) (citations

---

10. A company's contributions to benefit funds, such as in this case, constitute plan assets under 29 U.S.C. § 1002(21)(A) as they become due. 29 C.F.R. § 2510.3–102; *Hanley v. Giordanos Restaurant, Inc.*, 1995 WL 442143, *4 (S.D.N.Y. July 26, 1995); *Connors v. Paybra Mining Co.*, 807 F.Supp. 1242 (S.D.W.Va.1992); *Galgay v. Gangloff*, 677 F.Supp. 295 (M.D.Pa.1987), *Aff'd* 932 F.2d 959 (3d Cir.1991).

omitted); *Blatt v. Marshall & Lassman,* 812 F.2d 810, 812 (2d Cir.1987). Consistent with that intent, courts apply a functional test to determine who is a fiduciary, and do not merely rely on job titles. *Mertens v. Hewitt Assocs.,* 508 U.S. 248, 262, 113 S.Ct. 2063, 124 L.Ed.2d 161 (1993); *see Farm King Supply, Inc. v. Edward D. Jones & Co.,* 884 F.2d 288, 292 (7th Cir. 1989) (stating that "[w]hether a person is a fiduciary is determined by an objective standard; it matters not that the person may subjectively believe that he or she is not a fiduciary"). "A corollary of this functional approach to determining fiduciary status is that someone who holds no position with a plan may become a fiduciary if that person exercises de facto control over a fiduciary function." William E. Knepper and Dan A. Bailey, *Liability of Corporate Officers and Directors* § 9.03 (7th ed.2003) (citations omitted).

▮▮ Individual corporate officers are not ERISA fiduciaries per se merely by virtue of their offices. *Id.* (citing *Confer v. Custom Eng'g Co.,* 952 F.2d 34 (3d Cir. 1991); *Riley v. Murdock,* 890 F.Supp. 444 (E.D.N.C.1995), *aff'd* 83 F.3d 415 (4th Cir. 1996)). Rather, officers or other individuals are not ERISA fiduciaries unless they exercise discretionary roles concerning plan administration. *See Confer,* 952 F.2d 34; *Bannistor v. Ullman,* 287 F.3d 394, 403–04 (5th Cir.2002) (holding company officers to be fiduciaries where they used plan assets, employee contributions, to pay creditors); *Hanley v. Giordano's Restaurant, Inc.,* 1995 WL 442143, *3–4 (S.D.N.Y. July 26, 1995); *Connors v. Paybra Mining Co.,* 807 F.Supp. 1242 (S.D.W.Va.1992), *appeal dis'd,* 21 F.3d 421, 1993 WL 631932 (4th Cir.1993) (holding that once an officer or director is deemed a fiduciary he may be personally liable for damages caused by any breach of trust); *Galgay v. Gangloff,* 677 F.Supp. 295, 301 (M.D.Pa.1987).[11] "ERISA requires a fiduciary to 'discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries.'" *Cyrus,* 310 F.3d at 935 (quoting 29 U.S.C. § 1104(a)(1)). Under 29 U.S.C. § 1109(a), any person who is a fiduciary and breaches a fiduciary duty "shall be personally liable to make good to such plan any losses to the plan resulting from such breach." Here, Plaintiffs allege that the amounts that should have been segregated from the wages of electricians and paid to Plaintiffs were used for other purposes in violation of 29 U.S.C. § 1003, which speci-

---

**11.** Under Section 515 of ERISA, 29 U.S.C. § 1145 (which imposes a duty on employers to make all necessary contributions to multiemployer pension plans such as Plaintiffs in this case, in accordance with the terms of the plan or collective bargaining agreement), "the weight of authority holds that corporate officers and directors are not included in the statutory definition ... and are not exposed to liability for their corporation's failure to make such contributions" unless the plaintiff can show that the officer was acting as the alter ego of the corporation or that piercing the corporate veil is warranted for other reasons. *Liability of Corporate Officers and Directors* § 9.10 (citations omitted); *see Scarbrough v. Perez,* 870 F.2d 1079, 1083–84 (6th Cir.1989); *see also Hanley,* 1995 WL 442143, *2 (holding no personal liability under Section 515 but finding officer could be personally liable for breach of fiduciary duty). The Court has reviewed an array of cases invoking this proposition in lawsuits involving 29 U.S.C. § 1145 to find no personal liability for a defendant officer. The Court finds that those cases are distinguishable for two reasons. First, Plaintiffs in this case do not explicitly invoke 29 U.S.C. § 1145. Second, this case is not merely one of KTE's and Cates, Inc.'s failure to make its contributions to Plaintiffs. Rather, the allegations in No. 3:02–0152 are that Mr. Cates misappropriated contributions in violation of other ERISA provisions and his fiduciary duty. Accordingly, the Court believes that the cases finding no personal liability under Section 515 are distinguishable, and that the cases cited *supra* and *infra* for the proposition that an officer may be personally liable as a fiduciary are controlling.

fies that the plan assets "shall never enure to the benefit of any employer."

The Second Circuit accepted a similar argument, made by a union pension fund trustee on behalf of workers, in *LoPresti v. Terwilliger*, 126 F.3d 34 (2d Cir.1997). Similarly to this case, in *LoPresti* the individual defendants, two brothers who were corporate officers, were the only signatories on the defendant company's checking account. *Id.* at 40. They signed checks payable to the plaintiff funds. *Id.* "Of equal if not more import, though, is that . . . [one defendant] had a role in determining which bills to pay, in that he decided which creditors were to be paid out of the Company's general account (which, during the relevant time frame, included employee Fund contributions), and when those creditors were to be paid." *Id.* (internal quotations omitted).

The Second Circuit reversed in part the trial court's legal conclusion after a bench trial that two corporate officers were not plan fiduciaries under ERISA because they did not administer the pension funds. *Id.* The Second Circuit concluded that the trial court erred by focusing on the fact that the individual defendants were not trustees and by ignoring their actual control over disposition of the plan assets. *Id.* (explaining that a defendant's "commingling of plan assets with the Company's general assets, and his use of those plan assets to pay Company creditors, rather than forwarding the assets to the Funds means that he 'exercise[d] authority or control respecting . . . the disposition of [plan] assets,' and hence [was] a fiduciary for purposes of imposing personal liability under ERISA") (citations omitted); *see also Connors*, 807 F.Supp. at 1246 (company officers exercised authority or control respecting management or disposition of plan assets, and thus were ERISA fiduciaries where they made 'personal, conscious choices' to use withheld employee contri-

butions to cover company expenses); *United States v. Panepinto*, 818 F.Supp. 48 (E.D.N.Y.1993), *aff'd* 28 F.3d 103 (2d Cir. 1994) (holding that once an employer fails to make required contributions to an ERISA plan, it exercises control respecting the disposition of assets of an ERISA plan and thereby becomes a plan fiduciary).

Mr. Cates was the only individual authorized to write checks on KTE's account after May 2000. He had specific knowledge of the amounts due Plaintiffs. Instead of making complete payment for those amounts, however, he paid some contributions but also used the funds to pay other creditors, including his own company, U.S. Rental. By failing to pay the amounts owed to Plaintiffs under ERISA, Mr. Cates personally caused assets of the funds administered by Plaintiffs and contributed to by KTE's workers to enure to the benefit of KTE, Cates, Inc., or U.S. Rental.

Mr. Cates breached his fiduciary duty, and he is liable to the Plaintiffs for any losses they suffered as a result. Indeed, although Plaintiffs did not present this argument, it appears that Mr. Cates, as a de facto, functional fiduciary, may also have violated ERISA's prohibition on transactions by a "party in interest." 29 U.S.C. § 1003(14). A party in interest with respect to an employee benefit plan includes a fiduciary, employer, 50 percent shareholder, or director or officer of an employer. Among other prohibited transactions, a fiduciary shall not cause the plan to engage in a transaction if he knows that the transaction constitutes a direct or indirect transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan. 29 U.S.C. § 1107.

Moreover, a fiduciary "shall not . . . deal with the assets of the plan in his own interest or for his own account," or "in his

individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries." 29 U.S.C. § 1106(b). ERISA "is virtually a per se prohibition against the enumerated transactions." Liability of Corporate Officers and Directors § 9.06. Indeed, the Supreme Court has ruled that these prohibitions apply not only to fiduciaries but also to parties in interest, which Mr. Cates certainly was, and that a party in interest who is not a fiduciary may be sued by plan participants, beneficiaries, or fiduciaries for causing the plan to engage in prohibited transactions. *Harris Trust & Savings Bank v. Salomon Smith Barney,* 530 U.S. 238, 120 S.Ct. 2180, 147 L.Ed.2d 187 (2000).

Here, Mr. Cates transferred plan assets to his subsidiary, U.S. Rental, and he used those assets for the benefit of Cates, Inc. and his related companies, in violation of the foregoing ERISA provisions.

Plaintiffs shall prevail on their claims against Mr. Cates for breach of fiduciary duty. Judgment will be entered against Mr. Cates in favor of the Southern Electrical Health Fund and Carolinas Electrical Workers Retirement Fund for work performed by KTE electricians at the Pope AFB from March through August 2000, in the amounts of $75,991.26 and $35,200.15, respectively, for a total of $111,191.41.

## D. Attorney Fees and Post–Judgment Interest

### 1. Attorney fees

Plaintiffs request attorneys fees under 29 U.S.C. §§ 1131(g)(1) and 1131(g)(2). The latter provision provides: in any civil action by a fiduciary for or on behalf of a plan to enforce section 1145 . . . in which a judgment in favor of the plan is awarded, the court *shall* *award* the plan—(A) the unpaid contributions, (B) interest on the unpaid contributions, (C) an amount equal to the greater of—(i) interest on the unpaid contributions, or (ii) liquidated damages provided for under the plan in an amount not in excess of 20 percent (or such higher percentage as may be permitted under Federal or State law) of the amount determined by the court under subparagraph (A), (D) reasonable attorney's fees and costs of the action, to be paid by the defendant, and (E) such other legal or equitable relief as the court deems appropriate.

(emphasis added). Plaintiffs claims in Nos. 3:00–0448, 3:01–0216, and 3:02–0129 are based on violations of 29 U.S.C. § 1145, which governs delinquent contributions. Accordingly, an award of interest, penalties, fees, and costs is mandatory. Plaintiffs' claims against Mr. Cates, individually, in No. 3:02–0152 involve violations of 29 U.S.C. §§ 1103, 1104, and 1109. Accordingly, the Court will interpret Plaintiffs' request for attorney fees in No. 3:02–0152 under 29 U.S.C. § 1131(g)(1), which provides that in civil actions to recover delinquent pension benefit plan contributions under ERISA, "the court in its discretion may allow a reasonable attorney's fee and costs of action to either party." Nevertheless, "[a]s a general rule, then, a reasonable attorney's fee should be awarded to parties who prevail in ERISA actions." *Central States Southeast and Southwest Areas Pension Fund v. Hitchings Trucking, Inc.,* 492 F.Supp. 906, 909 (E.D.Mich.1980). Thus, the Court finds that Plaintiff is entitled to reasonable attorneys' fees in No. 3:02–0152 as well. Plaintiffs are directed to submit evidence to the Court regarding attorneys' fees and costs. The Court will then determine the reasonableness of the fees and make the final calculations.

### 2. Post-judgment interest

██ Post-judgment interest is governed by 28 U.S.C. § 1961, which applies only to "money judgments" that are "recovered in a district court". *Audiovisual Publishers, Inc. v. Cenco Inc.*, 964 F.Supp. 861, 880 n. 24 (S.D.N.Y.1997). Courts have held that § 1961 permits post-judgment interest on monetary amounts that a judge or jury awards after litigation. *See Isaiah v. City of New York*, No. 96 CIV. 1323 BSJ, 1999 WL 38846, * 1 (S.D.N.Y. Jan.29, 1999).

Post-judgment interest shall be calculated at the interest rate equal to the weekly average one-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve, for the calendar week preceding the date of the judgment. Post-judgment interest shall be calculated assuming that damages accrued from judgment until the judgment is paid.

## VI. CONCLUSION

For the reasons stated herein, the Court finds Cates, Inc., and its owner and chief executive officer, John W. Cates, to be in contempt for violation of the Court's temporary injunction entered in Civil Action No. 3:00–0448, with the contempt to be purged by paying to Plaintiffs a compliance fine in the amounts required to be paid by the injunction. The Court will enter judgment accordingly. Further, the Court will enter judgment in the remaining three cases as follows: (1) in favor of Plaintiffs and against Cates, Inc. and Heritage in Civil Action No. 3:01–0216; (2) in favor of Plaintiffs and against Cates, Inc. and Heritage in Civil Action No. 3:02–0129; and (3) in favor of Plaintiffs and against Mr. Cates in Civil Action No. 3:02–0152. The Court will GRANT Plaintiffs' request for attorney fees and post-judgment interest. The Court further finds that it lacks jurisdiction over the cross-claims and they will be dismissed.

An appropriate ORDER will be entered.

## *ORDER*

Plaintiffs brought these consolidated actions alleging that they are entitled to unpaid pension and health fund contributions from Defendants and Third–Party Defendants, pursuant to collective bargaining agreements, the Miller Act, and ERISA. The bench trial of this action was held from June 3 through June 6, 2003. The Court heard evidence on the following remaining issues in each case:

(1) No. 3:00–0448—*Southern Electrical Health Fund, et al. v. Donna Kelley and Joe Kelley d/b/a K.T.E. Electric ("KTE") v. John W. Cates Construction Co., Inc. ("Cates, Inc."):* the only remaining issue is whether Mr. Cates and/or Cates, Inc. should be held in contempt for violating the temporary injunction;

(2) No. 3:01–0216—*Southern Electrical Retirement Fund, et al. v. Cates, Inc., Joe F. Kelley and Donna J. Kelley each d/b/a KTE, and Heritage Mutual Insurance Co. ("Heritage"); Cates Inc. v. Joe F. Kelley and Donna J. Kelley each d/b/a KTE v. Cates Inc.:* the only remaining issue is whether Cates, Inc. received notice of the amount of unpaid contributions claimed by Plaintiffs as required under the Miller Act;

(3) No. 3:02–0129—*United States ex rel. Southern Electrical Health Fund, et al. v. Cates, Inc., Joe Kelley, Donna Kelley each d/b/a KTE, and Heritage:* the only remaining issue is whether Cates, Inc. received notice of the amount of unpaid contributions claimed by Plaintiffs as required under the Miller Act; and

(4) No. 3:02–0152—*Southern Electrical Retirement Fund and Carolinas Electrical Workers Retirement Fund v. John W. Cates:* the only remaining issue is whether Mr. Cates, as president and chief executive officer of Cates, Inc., and allegedly in control of KTE, used corporation funds to pay other creditors instead of submitting contributions and payments to Plaintiffs as required by the collective bargaining agreements between Plaintiffs and KTE, ERISA, 29 U.S.C. §§ 1103, 1104, and 1109, and the Court's Order of August 28, 2000, granting Plaintiffs a temporary injunction.

For the reasons more fully outlined in the Memorandum entered herewith, which constitutes the Court's findings of fact and conclusions of law as required by Rule 52(a) of the Federal Rules of Civil Procedure, the Court finds as follows:

(1) No. 3:00–0448—John W. Cates and Cates, Inc. are in contempt for violating the temporary injunction (Docket Entry No. 12) and are hereby DIRECTED to pay to Plaintiffs a compliance fine in the amount of $145,258.68, to be allocated among Plaintiffs as follows: $75,991.26 to the Southern Electrical Health Fund; $35,200.15 to the Carolinas Electrical Workers Retirement Fund; $15,181.64 to the National Electrical Benefit Fund; $3,027.19 to the Carolinas Electrical Workers Joint Apprenticeship & Training Fund; $3,339.01 to the Atlantic Coast Chapter—National Electrical Contractors Association ("NECA"); $10,912.48 to Local 553 International Brotherhood of Electrical Workers ("IBEW"); $201.83 to the National Labor Management Cooperation Committee; $396.06 to the Coalition for Political Action; and $1,009.86 to the Board 63 Collection Account Trust;

(2) No. 3:01–0216—in favor of Plaintiffs and against Cates, Inc. and Heritage Mutual Insurance Company ("Heritage"), jointly and severally, for a total of $145,258.68, to be allocated in the same manner and to the same Plaintiffs as in No. 3:00–0448;

(3) No. 3:02–0129—in favor of Plaintiffs and against Cates, Inc. and Heritage, jointly and severally, in the amount of $42,911.20, to be allocated as follows: $32,755.80 to NECA–IBEW Health Fund; and $10,155.40 to the Southern Electrical Retirement Fund; and

(4) No. 3:02–0152—in favor of Plaintiffs and against Mr. Cates for a total of $111,191.41, to be allocated as follows: $75,991.26 to Southern Electrical Health Fund and $35,200.15 to the Carolinas Electrical Workers Retirement Fund.

Plaintiffs also seek post-judgment interest and attorney fees and costs. Post-judgment interest shall be calculated, assuming that damages accrued from judgment until the judgment is paid, at the interest rate equal to the weekly average one-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve, for the calendar week preceding the date of the judgment. The Court finds that Plaintiff is entitled to reasonable attorneys' fees. Plaintiff is directed to submit evidence to the Court regarding attorneys' fees and costs in accordance with Local Rule 13(e). The Court will then determine the reasonableness of the fees and make the final calculations.

The Court further finds that it lacks jurisdiction over the cross-claims, and they are hereby DISMISSED WITHOUT PREJUDICE.

This action is hereby DISMISSED.

It is so ORDERED.